RICHARD B. McGLYNN, INDIVIDUALLY AND THE COMMITTEE TO ELECT RICHARD MCGLYNN, GOVERNOR, RESPONDENTS, v. NEW JERSEY PUBLIC BROADCASTING AUTHORITY AND NEW JERSEY NIGHTLY NEWS, APPELLANTS.

Argued September 22, 1981—Decided October 19, 1981.

*Barbara A. Harned,* Deputy Attorney General, argued the cause for appellants (*James R. Zazzali,* Attorney General of New Jersey; *Erminie L. Conley,* Assistant Attorney General, of counsel).

*Floyd Abrams,* a member of the New York Bar, argued the cause for *amicus curiae* WNET/Thirteen (*Riker, Danzig, Scherer & Hyland,* attorneys; *Floyd Abrams, Gregg Young, Charles S. Warren* and *Sandra S. Baron,* members of the New York Bar, of counsel; *Frank J. Miele,* on the brief).

*Richard B. McGlynn* argued the cause *pro se* (*Stryker, Tams & Dill,* attorneys).

*B. Theodore Bozonelis* argued the cause for respondent Committee to Elect Richard McGlynn Governor (*Sweeney, Bozonelis, Staehle and Woodward,* attorneys).

*Amos Gern* submitted a brief on behalf of *amici curiae* The Corporation for Public Broadcasting, The National Association

of Broadcasters, The National Association of Public Television Stations, National Public Radio, The Public Broadcasting Service and The Reporters Committee for Freedom of the Press (*Gern, Stiber, Dunetz, Davison & Weinstein*, attorneys; *Paul A. Mutino, Thomas L. Root, Erwin G. Krasnow, Theodore D. Frank, Pamela Stanton Baron, Janice F. Hill, Eric H. Smith, Nancy Hendry, Jack C. Landau* and *Sharon P. Mahoney*, members of the District of Columbia Bar, of counsel, and *Stephen E. Nevas*, member of the Massachusetts Bar, of counsel).

*William W. Robertson*, United States Attorney, and *Bette Uhrmacher*, Assistant United States Attorney, submitted a brief on behalf of *amicus curiae* Federal Communications Commission (*William W. Robertson*, attorney; *Stephen A. Sharp*, a member of the District of Columbia Bar, and *Daniel M. Armstrong* and *Lisa B. Margolis*, members of the New York Bar, of counsel).

The opinion of the Court was delivered by

PASHMAN, J.

This is a case of major importance. It transcends the claims of the individual litigants who were political candidates in the recently concluded gubernatorial primary election. The overriding issue concerns the relationship between the journalistic freedom which has been granted the New Jersey Public Broadcasting Authority and its duty of fairness in the coverage of gubernatorial campaigns.

We now hold that the Authority has been given a wide range of journalistic freedom under Federal and State law in determining the content and scope of television broadcast coverage of gubernatorial election campaigns. This freedom has been given by the Legislature to the Authority to effectuate the significant public policy goal of providing the people of New Jersey with needed coverage of the subjects and events which most directly affect them. The Authority, though a governmental instrumentality, is intended by the Legislature to exercise its discretion with the independence and freedom that characterize a free and vibrant press. At the same time, its important responsibilities

are to be discharged within a framework of fairness and impartiality comporting generally with prevailing federal regulatory philosophy.

In so holding, we strongly endorse the fundamental commitment which the Legislature has made for the people of this State in creating a public broadcasting station to carry out these important goals. We fully anticipate that the judiciary will have no direct or active role in this arena. This is as it should be. However, if any controversy should come before the courts, the Judiciary will unhesitatingly honor the commitment of the Legislature to a free and fair public broadcasting authority.

The determination which we reach today results from the reargument of this appeal. We have had the opportunity to consider the implications of the case in greater depth than was possible when it first reached us on an emergent basis. This reconsideration has brought the entire court to a different conclusion than was earlier held. Accordingly, we reverse our prior order.

We need to briefly reiterate the course which this appeal has taken. Richard McGlynn, later joined by Jack Rafferty, candidates for the Republican nomination for governor, challenged the refusal of the New Jersey Public Broadcasting Authority to include them in a forum on five important issues (Forum) to be telecast by the Authority on its "A Closer Look" program during the final week of the 1981 primary campaign. When the case reached the Appellate Division, two of the five scheduled segments had already been broadcast. All the segments included statements on the issues by four of the eight Republican candidates. McGlynn alleged that his exclusion from the program violated *N.J.S.A.* 19:44A–39 (Section 14 of the 1974 "Act to amend and supplement 'The New Jersey Campaign Contributions and Expenditures Reporting Act'"), *N.J.S.A.* 48:23–7(h) (Section 7 of the "New Jersey Public Broadcasting Authority Act"), 47 *U.S.C.* § 315 and the First and Fourteenth Amendments to the United States Constitution.

Upon plaintiffs' emergent application, the Appellate Division ordered that all excluded candidates be included in any further showings of the Forum. The court further directed that statements by the excluded candidates on the issues already discussed be broadcast at approximately the same hour that the originals were shown. We heard the Authority's appeal on an emergency basis and affirmed the Appellate Division's order.[1] On appeal, the Honorable William J. Brennan, Jr., Associate Justice of the United States Supreme Court, refused to issue a stay.

After the primary election, we granted the Authority's petition for rehearing because the public interest would be served by a clarification of our earlier summary ruling.

I

The New Jersey Public Broadcasting Authority (Authority), an instrumentality of the State of New Jersey, was established in 1968 by the New Jersey Public Broadcasting Authority Act, *N.J.S.A.* 48:23–1 *et seq.* The Authority owns and operates WNJS, WNJM, WNJB and WNJT, four educational television stations which constitute the New Jersey public television network. All four stations are licensed by the Federal Communications Commission (FCC).

Plaintiffs Richard McGlynn and Jack Rafferty were among the eight candidates for the Republican nomination for governor of New Jersey. Ann Klein[2] was one of thirteen candidates for the Democratic nomination. The primary election was held on

---

[1]The Appellate Division's order included WNET (Channel 13) which broadcasts "A Closer Look" in conjunction with the Public Broadcasting Authority. We reversed the Appellate Division judgment as to WNET and dismissed the proceeding against it since WNET, being privately owned, is not subject to *N.J.S.A.* 19:44A–39.

[2]Ann Klein is not a party to this proceeding. She was also excluded from the "A Closer Look" program, but she brought her complaint to the FCC, which denied her petition. *See Ann Klein,* Docket No. 8330–B, C5–860 (5/29/81).

June 2, 1981.[3]  During the primary campaign, the Authority provided extensive television coverage as required by the New Jersey Campaign Contributions and Expenditure Reporting Act, *N.J.S.A.* 19:44A–39.

As a result of the inadequacy of television coverage of New Jersey gubernatorial races by the private New York and Philadelphia stations, *see infra* at 122-23, significant responsibility for keeping the New Jersey viewing public informed about the candidates and issues falls upon New Jersey public television. The problems of election coverage by the New York and Philadelphia stations were exacerbated in this case by the presence of 21 candidates in the race.  The Authority fulfilled its responsibility in several ways.  First, it aired a series of ten-minute profiles in which each candidate received the opportunity to discuss the issues.  Each profile was shown twice during May. Second, "McLaughlin's Beat," a regularly scheduled weekly interview program, broadcast interviews with the candidates in groups of two or three from March 5 through May 21.  Third, the Authority covered two League of Women Voters forums, one for each party, to which all candidates were invited.  Finally, the various candidates appeared on "New Jersey Nightly News" (Nightly News).  There is no evidence of how often each candidate appeared on the evening news.  However, "A Closer Look," a ten-minute segment of the Nightly News which generally provides in-depth analysis of a single issue or event, broadcast profiles of each candidate in mid-April.

As the campaign neared its conclusion, Herbert Bloom, Executive Producer of Nightly News, decided to devote "A Closer Look" to what he described in an affidavit to be "five very significant issues in the campaign."  All 21 candidates had been asked to comment on these issues, and their responses were taped approximately four weeks before they were to be shown.

---

[3]Candidates McGlynn, Rafferty and Klein did not finish among the front runners.

Bloom explained that "there was not sufficient time remaining before the primary election * * * to cover all 21 candidates." He therefore used his "professional news judgment .... in consultation with [his] senior staff," to select a group of leading candidates whose views would be broadcast. Ten of the 21 candidates were chosen for this final series of programs.

Among the candidates excluded from this forum were McGlynn and Rafferty. On May 25, 1981, the four New Jersey public television stations and WNET/Thirteen announced their intention to air the series of discussions on "A Closer Look." The following day, McGlynn and the Committee to Elect Richard McGlynn Governor filed a complaint in the Superior Court, Chancery Division. The complaint alleged that the Authority had refused McGlynn's request to be included. McGlynn alleged that the exclusion violated his rights under the Federal Communications Act, the New Jersey Campaign Expenditures and Reporting Act, the Public Broadcasting Authority Act, and the First and Fourteenth Amendments of the United States Constitution.

The Chancery Division found the complaint to be an appeal from an administrative determination by the Authority and so transferred the case to the Appellate Division on May 26. At this point, Rafferty intervened as a plaintiff. The Appellate Division issued its Order on May 27 directing that the excluded candidates be included in any future forum and that statements by the excluded candidates on the issues discussed in the telecasts already aired be broadcast at approximately the same hour as the original segments were shown. We affirmed the order as to the Authority on May 27, and the Authority aired the planned "Closer Look" segments with all candidates for governor included.

After the primary election, we granted the Authority's Petition for Rehearing.

## II

This case is technically moot since the primary election has been held and respondents are no longer candidates for governor. However, "we have often recognized that courts may hear and decide cases which are technically moot where issues of great public importance are involved." *In re Geraghty*, 68 *N.J.* 209, 212 (1975). *See, Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n,* 64 *N.J.* 17, 22 (1973); *John F. Kennedy Memorial Hospital v. Heston*, 58 *N.J.* 576, 579 (1971); *East Brunswick Tp. Bd. of Ed. v. East Brunswick Tp. Council*, 48 *N.J.* 94, 109 (1966). This case raises important issues concerning the role of New Jersey public television in covering state elections. Failure to elaborate upon our decision of May 27 would inevitably force the courts to face further cases of this nature, possibly on an emergent basis, without any useful precedent construing the New Jersey statutes at issue here. We have therefore decided to resolve the issues presented.

## III

The starting point for our discussion must be the New Jersey statutory scheme, which is comprised of the New Jersey Public Broadcasting Authority Act, *N.J.S.A.* 48:23–1 *et seq.*, and Section 14 of the act to amend and supplement the "New Jersey Campaign Contributions and Expenditures Act," *N.J.S.A.* 19:44A–39, as amended in April 1981, *L.*1981, *c.* 107. The Authority's obligations to the people of New Jersey regarding coverage of their gubernatorial election derive from these statutory provisions. Yet there are no reported cases construing either act.[4]

---

[4]The Appellate Division's order of May 27, and our affirmance of that order, were based on plaintiffs' New Jersey statutory claims. This opinion is to clarify that prior decision. Since respondents have obtained the relief which they sought, we find no cause here to address their claims made under the Federal Communications Act and the First and Fourteenth Amendments of

## A.  Overview

The Authority was created in 1968 in response to the unique dependence of New Jersey viewers on out-of-state television stations.  Although the ninth-largest state in population, New Jersey is one of only two states without at least one licensed VHF television station.  New Jersey viewers depend on seven stations from New York City and four from Philadelphia for VHF television coverage.  Although several private UHF stations are located in New Jersey, their signals do not have the power to reach the entire state and their viewership is too small to substantially affect New Jersey's dependence on out-of-state television.  The FCC found in 1976 that "there is a need for improved New Jersey television service ... by some or all of those mass-audience stations licensed to either New York City or Philadelphia."  *State of New Jersey Television Service*, 58 *FCC* 2d 790, 804 (1976).

This situation may have been the result of federal communications policy.  A 1961 FCC primer, issued to New York and Pennsylvania stations detailing the extent of their obligation to cover New Jersey elections, underscores the problem.

> [A] New York City broadcaster might broadcast news and public affairs programming concerning major events in outlying cities or areas receiving its signal, but could hardly be expected to give in-depth coverage of local elections from Connecticut or Central New Jersey. A Connecticut or New Jersey station might cover such elections, but we would not fault a New York station that chose, in its discretion, to ignore them. [Quoted in *State of New Jersey Television Service*, 58 *FCC* 2d 790, 798 (1976)]

According to the New Jersey Coalition for Fair Broadcasting, which monitored New York and Philadelphia news telecasts in 1973, only 13% of Philadelphia local news broadcasts and 5% of

---

the United States Constitution.  We also express no opinion as to whether a state court may properly hear claims under the Federal Communications Act.

New York local news broadcasts concerned New Jersey topics. *New Jersey Television Service, supra,* at 790.[5]

It was partly to alleviate this longstanding paucity of television coverage of New Jersey news that New Jersey created the Public Broadcasting Authority.[6] The Authority is governed by the Public Broadcasting Commission, which consists of five *ex-officio* members (the Commissioners of Education and Community Affairs, the Chancellor of Higher Education, the State Treasurer and the Attorney General) and ten other persons appointed by the Governor with the advice and consent of the Senate. The Commission appoints the Executive Director sub-

---

[5]*See,* New Jersey Television Service, supra, *at 796, suggesting that New Jersey news coverage by the New York and Philadelphia VHF stations has improved notably since 1973.*

The FCC continued, however, by stating that

... it must be observed that these stations' New Jersey coverage, partly because they serve large multi-state areas and partly because of the financial, logistical, and time consumption factors associated with obtaining field video reports, does not generally consist of the kind of day-to-day detailed, visual coverage which can be offered by television stations serving less expansive and more discrete areas. [*Id.* at 796]

[6]The Report of the Governor's Commission on Public Broadcasting for New Jersey (1968) noted examples of this problem:

A whole new geographical area, the richest undeveloped real estate in the world—the New Jersey meadowlands—is under discussion as this report is being prepared. No New York or Philadelphia television station has covered in New Jersey any of the hearings—hearings which have produced serious statewide discussion for the first time. Public broadcasting for New Jersey should be reporting the proceedings of these hearings. Public broadcasting for New Jersey will analyze in depth these issues.

Eight days of public hearings on crime in New Jersey early in March have aroused considerable interest and concern. The sensational aspects of this story may be grist for commercial television's mill, but the more profound implications of the findings can best be covered by public broadcasting.

An excellent study of the civil disorders in three cities in New Jersey has recently been published. Of the ninety-nine recommendations it made, few citizens in New Jersey could probably name more than five. If there were public broadcasting now, each recommendation could receive attention and study. [*Id.* at 68–69]

ject to the approval of the Governor. The Director serves as the chief executive officer of the Authority. Either the Commission or the Governor may replace him, although in the latter case he is given the right to notice and a hearing before he can be dismissed. *N.J.S.A.* 48:23–4 and –5.[7] The Authority is empowered to "establish, own and operate" noncommercial television and radio stations, *N.J.S.A.* 48:23–7(d), and to seek FCC licenses for them, *N.J.S.A.* 48:23–7(e).

The act creating the Authority contains two relevant provisions concerning the content of its programming. *N.J.S.A.* 48:23–9 prohibits the Authority from "supporting or opposing any political party or candidate for public office." *N.J.S.A.* 48:23–7(h) empowers the Authority to

[a]ssume responsibility for the character, diversity, quality, and excellence of programming which is released via its licensed facilities, *provided that programs or series of programs of a controversial nature shall be presented with balance, fairness and equity.* [emphasis added]

These provisions will be discussed at greater length below, after the remainder of the statutory scheme is set forth. For now it suffices to note that although these provisions vest the Authority with broad discretion in news coverage, they also define the contours for the exercise of this discretion, thus belying any argument that the Legislature intended to free the Authority completely from all statutory direction.

As part of a comprehensive revision of the Campaign Contributions and Expenditures Act, the Legislature in 1974 enacted *N.J.S.A.* 19:44A–39, which in turn was amended significantly in 1980 and 1981. The policy underlying the 1974 act was expressed by *N.J.S.A.* 19:44A–27:

It is hereby declared to be a compelling public interest and to be the policy of this State that general election campaigns for the office of Governor shall be financed with public support pursuant to the provisions of this act. It is the intention of this act that such financing be adequate in amount so that

---

[7]The degree to which a Governor controls the management of the Authority is noteworthy. *See infra* at 126–127.

candidates for election to the office of Governor may conduct their campaigns free from improper influence and so that persons of limited financial means may seek election to the State's highest office.

One of the crucial problems facing any candidate, especially one of limited means, is access to television. This is particularly true in New Jersey because the New Jersey viewing market is dominated by out-of-state stations. A candidate wishing to buy air time must pay the high New York or Philadelphia rates, even though he needs to reach only a fraction of the markets served by the stations in those cities. In recognition of this special problem, the Legislature included a provision concerning the Authority in its campaign spending reform statute.

*N.J.S.A.* 19:44A–39 originally concerned only the general election. It directed the Authority to promote full discussions of public issues by the candidates in the general election for governor, and mandated that the Authority set aside a specified amount of time for each candidate on the ballot. It was amended in 1980 as part of the bill extending public financing to the primaries, adding a guarantee of fixed amounts of air time for each primary candidate.[8]

---

[8]After the 1980 amendment, *N.J.S.A.* 19:44A–39 provided:

a. The New Jersey Public Broadcasting Authority established under P.L.1968, c. 405 (C. 48:23–1 et seq.) shall promote full discussions of public issues by the candidates for nomination for election to the office of Governor on the ballot in any primary election, free of charge to the candidate. The authority shall make available at least 2 hours of time on its stations for joint appearances by the candidates, and at least 15 minutes of time on its stations for individual appearances by each of the candidates. The authority may promulgate such rules and regulations as may be necessary to effectuate the purpose of this subsection.

b. The authority shall promote full discussions of public issues by the candidates for the office of Governor on the ballot in any general election, free of charge to any such candidate. The authority shall make available at least 1 hour of time on its stations for joint appearances by such candidates, and at least 1 additional hour of time on its stations for individual appearances by each of such candidates. The authority may promulgate such rules and regulations as may be necessary to effectuate the purposes of this subsection.

In 1981, however, the Legislature again amended the statute, apparently in response to the unwieldy size of the 1981 primary field. *N.J.S.A.* 19:44A–39 now reads as follows:

The New Jersey Public Broadcasting Authority established under P.L.1968, c. 405 (C. 48:23–1 et seq.) shall promote full discussions of public issues by the candidates for nomination for election or election to the office of Governor on the ballot in any primary or general election, in accordance with Federal law and free of charge to the candidate. The authority may promulgate such rules and regulations as may be necessary to effectuate the purpose of this section.

Thus, the Legislature removed the specific minimum time provisions and replaced them with a general obligation to promote full discussions by the candidates in accordance with Federal law.

The issue presently before us is to determine what constraints, if any, these three statutory provisions—*N.J.S.A.* 48:23–7(h), *N.J.S.A.* 48:23–9 and *N.J.S.A.* 19:44A–39—were intended to place on the Public Broadcasting Authority's coverage of New Jersey gubernatorial elections. This determination must be made in light of the Authority's unique position as both an instrumentality of the New Jersey government and a crucial source of television exposure for gubernatorial candidates.

B.  *The Public Broadcasting Authority Act*

The "balance, fairness and equity" provision and the prohibition against political activities, *N.J.S.A.* 48:23–7(h) and –9, respectively, clearly prohibit the Authority from becoming an advocate for any political position or candidate. The Authority cannot endorse candidates or legislation and it cannot actively use its stations to advance its views on the public issues of the day. The Legislature envisioned full, balanced discussion of public issues.

The Legislature's need to mandate balance was obvious. As discussed, *supra* at 123–24, a Governor plays a substantial role in appointment of Authority personnel. Not only does he appoint the members of the Commission, which is "the head of the authority," *N.J.S.A.* 48:23–2, but he must approve the Commission's designee for Executive Director and he retains the power

to dismiss him. To eliminate the resulting risk that the Authority might become politicized, the Legislature enacted precautionary measures. The provisions are intended to eliminate any appearance of impropriety. The Legislature must have recognized that the public perception that a Governor was using the Authority to advance his own political ends would be almost as damaging as the reality, both to New Jersey public broadcasting and to New Jersey politics in general. Finally, regardless of the danger of improper influence, it was deemed inappropriate for the Authority to use its stations to advance particular political positions or candidates.

The Authority seeks a narrow construction of these provisions. The prohibition in *N.J.S.A.* 48:23–9 against "supporting or opposing any political party or candidate for public office" could be read merely to prohibit actual endorsement or financial contributions, and the "balance, fairness and equity" language of *N.J.S.A.* 48:23–7(h) could be interpreted to be a mere restatement of the "fairness doctrine" of the Federal Communications Act.[9] We do not believe that so narrow a construction was intended. The State statutory standards, though not necessarily inconsistent with the federal standards relating to fairness, are more expansive. In the present context, they encompass a duty to cover elections in a balanced fashion. Because of the weighty considerations underlying the Authority's duty to provide balanced coverage and in light of *N.J.S.A.* 19:44A–39, to be discussed presently, we hold that *N.J.S.A.* 48:23–7(h) mandates "balance, fairness and equity" in the Authority's coverage of the gubernatorial candidates. Similarly, we believe that since a substantial imbalance in the Authority's election coverage can have the same effect as an actual endorsement, *N.J.S.A.* 48:23–9

---

[9]The "fairness doctrine," embodied in 47 *U.S.C.* § 315(a), concerns balance among ideas, not balance among individual advocates of those ideas. *New Primer on Political Broadcasting and Cablecasting,* 69 *F.C.C.*2d 2209, 2215 (1978).

also encompasses a "balance, fairness and equity" constraint on Authority election coverage.

C. *N.J.S.A. 19:44A–39*

In ordering the Authority to include plaintiffs in its "Closer Look" forum on the issues, the Appellate Division found an "imperative of equal time" running through *N.J.S.A. 19:44A–39*. *McGlynn v. New Jersey Public Broadcasting Authority*, 181 *N.J.Super.* 577 (App.Div.1981). The Authority claims that any equal time obligation that might have been present in this provision prior to the 1981 amendment has been eliminated by that amendment. It asserts that the statute now requires merely promoting full discussion of the election itself, with the means of doing so and decisions on the participation of individual candidates left to the Authority subject only to the constraints of Federal law.

We start by examining the language of the amended provision. Nowhere does it contain the words "equal time." To read a strict equal time requirement into the statute would thus be an act of judicial legislation. That is not, however, to say that the statute does not impose an affirmative duty; at very least, the Authority is required to actively cover the campaign. The question is how the Legislature meant the Authority to carry out this directive. The Authority argues that it was given unbridled discretion to promote discussions by the candidates; respondents counter that the statutory guidelines constrain the Authority's discretion.

The Authority relies heavily on the reference to Federal law in *N.J.S.A. 19:44A–39*, as amended in 1981. The Authority argues that this demonstrates the Legislature's intent to remove any state restrictions on the amount of broadcast time each candidate was to receive. Thus, the Authority's policy would be governed solely by the Federal Communications Act, which gives maximum discretion to broadcasters.[10]

---

[10]*See* 134–137, *infra.*

The Authority seeks to buttress this position with the legislative history of the 1981 amendment, which was passed, at least partially, in response to the presence of 21 candidates on the ballot in the impending gubernatorial primaries. Realizing that the specific time provisions would hamper the Authority given the number of candidates to be covered, the Legislature delegated to the Authority the responsibility to determine how best to promote full discussions by the candidates. Thus, the sponsor's statement to the bill indicates that the amended bill

> would direct the New Jersey Public Broadcasting Authority to provide coverage of the gubernatorial primary and general election campaigns and give the authority the discretion, within the limits of Federal and *State Law*, as to the manner in which it does so. [emphasis added]

The committee statement accompanying the bill is similar in its direction:

> This bill amends the election laws to permit the New Jersey Public Broadcasting Authority a greater degree of flexibility in the promotion of the discussion of public issues by gubernatorial candidates in the primary and general election campaigns.

This legislative history is a good indicator of what the Legislature intended the 1981 amendment to provide. Evidently, the amendment was prepared as a response to the large 1981 primary field and the effects it would have on Authority election coverage. The amendment should be read in the light of its legislative history. Clearly, the Legislature's general approach to the problem was to vest greater discretion in the Public Broadcasting Authority. Nonetheless, we do not believe that the Legislature meant to remove all limitations on the Authority's discretion. Rather, the amendment was enacted to remove the minimum coverage requirements, and only thereby to increase the Authority's discretion regarding election coverage.

Several facts lead us to disagree with the Authority's argument that the State meant to repeal all constraints on Authority coverage of gubernatorial elections save those imposed by the Federal Communications Act. First, that construction renders the new provision mere surplusage, since the Authority is required to abide by the Federal Communications Act independent

of *N.J.S.A.* 19:44A–39.[11]   Such a construction is to be avoided wherever possible.   *In re Toms River Water Co.*, 82 *N.J.* 201 (1980); 2A Sutherland, *Statutory Construction* (4th ed. 1973), § 46.06.

Second, the mandate to "promote full discussions * * * by the candidates" denotes more than the general federal exhortation to operate in the public interest.   It at least requires the Authority to actively cover gubernatorial elections, but we believe that it does more.   Reading the statute in light of related statutory provisions, it is evident that the Legislature imposed a duty to promote full discussions by the candidates in a balanced, fair and equitable fashion.   It is difficult to see how the legislative mandate of full discussions among the candidates can be accomplished if some of the candidates are continually excluded from the discussions, or if the opportunity to appear provided to the candidates is grossly inequitable.   We believe that the Legislature did not intend such a result.

The language of the statute points directly to the opposite result.   It mandates discussion by "the candidates . . . on the ballot in any primary or general election . . . . "   *N.J.S.A.* 19:44A–39.   This language is inclusive; it does not give the Authority the liberty to continually exclude candidates who have fulfilled the legal requirements for getting listed "on the ballot."   It similarly would not allow unfair or imbalanced coverage of those candidates.

The concurring opinions contradict themselves in their interpretation of the State statute.   On the one hand, they concede that the statute imposes a duty to promote full discussions—a duty not imposed by federal law.   On the other hand, they say federal law grants the Authority complete discretion to determine the *manner* of compliance.   Our concurring colleagues thus

---

[11]*See* John F. Donato, *66* FCC *2d 599 (1977) (rebroadcast of taped debate by New Jersey Public Broadcasting Authority held not exempt from 315(a) because the broadcast was two days after the event taped).*

make the specious and groundless claim that the Legislature, while placing a legal duty upon the Authority, did not intend that the duty be enforced. Rather than recognize the legislative mandate, the concurring opinions creatively rewrite it.

We are persuaded as well by the context of the statute that *N.J.S.A.* 19:44A–39 was meant to preclude gross imbalance in the "full discussions," and that it must be read in light of the *N.J.S.A.* 48:23–7(h) mandate that controversial issues be presented with "balance, fairness and equity" and the *N.J.S.A.* 48:23–9 prohibition against supporting candidates. First, *N.J. S.A.* 19:44A–39 remains a part of major campaign spending reform legislation, the underlying theme of which is equalizing the opportunity of the candidates for governor to present their ideas to the populace. *See N.J.S.A.* 19:44A–27. Gross imbalance in access to television coverage would work against that goal.

Second, the statement of the sponsor of the 1981 amendment stated that the Authority was granted discretion "within the limits of Federal *and State* law." [Emphasis added] This makes clear that the Authority was meant to be subject to State regulation as well as FCC regulation. The reference must be to the other two provisions, discussed above, which deal with the content of the Authority's political programming: *N.J.S.A.* 48:23–7(h) and –9. We concluded earlier that those provisions mandated "balance, fairness and equity" in the Authority's coverage of the gubernatorial candidates. That conclusion strengthens our belief that *N.J.S.A.* 19:44A–39 places similar constraints on the Authority.

To sum up our discussion of the New Jersey statutory scheme, we conclude that the Public Broadcasting Authority Act and the amended Campaign Contributions and Expenditures Act must be read *in pari materia*. The provisions of each, separately, raise a strong implication that, consistent with its broad discretion to determine broadcast content, the Authority's campaign coverage must be executed with "balance, fairness and equity."

Reading them together, that conclusion becomes inescapable. We therefore hold that the Authority is vested with wide discretion in determining broadcast content but that, with respect to coverage of a gubernatorial campaign, it is required by New Jersey statute to promote full discussion of the issues by the candidates, consistent with "balance, fairness and equity."

The great discretion we have given the Authority goes completely unnoticed by our concurring colleagues, thus preventing an accurate reading of the majority's holding. They mistakenly assert that the majority has imposed a comprehensive regulatory scheme on the Authority, making judges the new programmers of New Jersey public television. They conjure up the vision of Big Brother watching over the Authority and "sitting with them at every meeting." (*Infra*, at 139–140) Nothing could be further from the truth. As we have construed it, State law gives great discretion to the Authority to make programming decisions, subject only to considerations of fairness.

Nor is there any basis for Justice Pollock's argument that our holding today may convert New Jersey public television into a "public forum" to which all citizens will have a right of access. We agree that such a result would be undesirable and was not intended by the Legislature. But we strongly reject the notion that this result follows from our holding today. We have certainly not created a general right of access to public television.

"Public forum" is a legal designation given to certain places, "such as public streets, sidewalks, and parks," L. Tribe, *American Constitutional Law* at 689, where historically everyone has been. free to speak, subject only to "time, place or manner" restrictions. *Id.* at 689. *See, e.g., United States Postal Service v. Council of Greenburgh Civic Associations,* 453 *U.S.* 114, 101 *S.Ct.* 2676, 69 *L.Ed.*2d 517 (1981); *Greer v. Spock,* 424 *U.S.* 828, 96 *S.Ct.* 1211, 47 *L.Ed.*2d 505 (1976).

This "public forum" concept has been strictly limited to those areas in which tradition mandates a right of access. *See, e.g.,*

*United States Postal Service, supra* (mailboxes not public forum); *Greer,* supra (public areas of military base not public forum); *Adderly v. Florida,* 385 *U.S.* 39, 87 *S.Ct.* 242, 17 *L.Ed.2d* 149 (1966) (grounds of county prison not public forum); *City of New York Municipal Broadcasting System,* 56 *F.C.C.2d* 169 (1975) (radio and television airwaves not public forum). The requisite tradition of general public access to the broadcast media is totally lacking.

Justice Pollock argues that the New Jersey statutory scheme, as we have construed it, converts New Jersey public television into a public forum. However, a place becomes a public forum only when it has been "dedicated to public use." *Muir v. Alabama Television Commission,* 656 *F.2d* 1012, 1020 (5th Cir., Sept.1981). The right of access created by New Jersey statute is limited to "candidates [for Governor] on the ballot." *N.J.S.A.* 19:44A–39. It thus concerns only legally qualified candidates, in only one election, which occurs only once every four years.

*CBS v. FCC,* 453 *U.S.* 367, 101 *S.Ct.* 2813, 69 *L.Ed.2d* 706 (1981), is directly on point. The United States Supreme Court there held that 47 *U.S.C.* § 312(A)(7), which gives candidates for federal office a right of access to FCC-licensed stations, does not create a general right of access.

> Petitioners are correct that the Court has never approved a *general* right of access to the media. Nor do we do so today. Section 312(a)(7) creates a *limited* right to "reasonable" access that pertains only to legally qualified federal candidates and may be invoked by them only for the purpose of advancing their candidacies once a campaign has commenced. [*Id.* 453 *U.S.* at 396, 101 *S.Ct.* at 2830 (emphasis in original)]

Our holding today will not give the public a general right of access to New Jersey public television.

## IV

This does not conclude our inquiry, however. It remains to be determined what "balance, fairness and equity" mean in the context of a gubernatorial election, and how that standard should be applied to the instant case. Before turning to those

issues, however, we must examine appellants' constitutional claims. Appellants have argued, first, that the Federal Communications Act pre-empts State law and, second, that the First Amendment precludes any State limitation on the editorial discretion of the Authority.

## A. The Supremacy Clause

### 1. Federal Communications Act

Most law concerning broadcast communication in the United States is derived from the FCA, 47 *U.S.C.* § 151 *et seq.*, specifically § 301 *et seq.* dealing with radio and television communication. The FCA created the FCC, a federal regulatory agency which is assigned the function of licensing radio and television stations. 47 *U.S.C.* § 303(*l*). All licensees are obligated to abide by the FCA and by regulations adopted pursuant to it by the FCC. The four television stations operated by the Authority are FCC licensees.

FCC licensees are subject to minimal content regulation. Licenses are awarded as "the public interest, convenience, and necessity will be served," 47 *U.S.C.* § 307(a), and licensees are required to "operate in the public interest." 47 *U.S.C.* § 315(a). But, for the most part, Congress and the FCC have limited government regulation of programming decisions.

One significant area of regulation is 47 *U.S.C.* § 315, the "equal opportunity" provision. Initially, it simply provided that any licensee allowing one candidate for elective office to "use" its station must allow all other candidates for that office the same opportunity to use the station. If air time is sold to one candidate, comparable air time must be offered to all candidates; if air time is given free to one candidate, it must be offered free to all.

Recognizing radio's [and television's] potential importance as a medium of communication of political ideas, Congress sought to foster its broadest possible utilization by encouraging broadcasting stations to make their facilities available to candidates for office without discrimination.... [*Farmers Educational and Cooperative Union v. WDAY*, 360 *U.S.* 525, 529, 79 *S.Ct.* 1302, 1305, 3 *L.Ed.2d* 1407 (1959)]

Congress realized that a grant of an FCC license was potentially a grant of significant power and concluded that licensees should be limited in their ability to parlay this power into electoral success for themselves or their favorites. *See* S.Rep.No. 562, 86th Cong., 1st Sess., U.S.Code Cong. & Ad.News pp. 2564, 2571 (1959); *Primer on Political Broadcasting, supra,* at 2216. Section 315 thus embodies the dual policy goals of active political debate and equal political debate.

In 1959, Congress altered the balance between these goals by significantly amending § 315(a), declaring that appearances by candidates on *bona fide* (1) newscasts, (2) news interviews, (3) news documentaries, or (4) coverage of news events do not constitute a "use" of the station which triggers the equal opportunity provision. It is universally accepted that this amendment was a response to the FCC's *Lar Daly* decision, *Columbia Broadcasting System,* 18 *P. & F. Radio Reg.* 238, *recon. den.,* 26 *F.C.C.* 715, 18 *P. & F. Radio Reg.* 701 (1959), in which televised film clips of Mayor Richard Daley, incumbent and candidate for re-election, performing various mayoral functions were held to trigger the equal opportunity doctrine. Congress feared that such an all-inclusive equal-time requirement "would tend to dry up meaningful . . . coverage of political campaigns," S.Rep.No. 562, *supra,* at 2572.

> The inevitable consequence [of *Lar Daly*] is that a broadcaster will be reluctant to show one political candidate in any news-type program lest he assume the burden of presenting a parade of aspirants. [*Id.* at 2571]

Thus, Congress concluded as a result of *Lar Daly* that active political debate and rigidly equal political debate were conflicting policy goals.

The Congressional response was to amend § 315 by adding the four exemptions enumerated above.[12] Thus Congress effectuat-

---

[12]Section 315, which has not been significantly changed since the 1959 amendment, now reads:

> (a) If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall

ed its conclusion that, insofar as news coverage was concerned, "the public benefits [of a high volume of news coverage] are so great that they outweigh the risk that may result from the favoritism that may be shown by some partisan broadcasters." S.Rep.No. 562, *supra*, at 2572.

Congress delegated to the FCC the responsibility to construe the new exemptions:

> It is difficult to define with precision what is a newscast, news interview, news documentary, or on-the-spot coverage of news event .... That is why the committee in adopting the language of the proposed legislation ... gave the Federal Communications Commission full flexibility and complete discretion ... [to determine whether a particular program is exempt]. [S.Rep.No. 562, *supra*, at 2574]

In exercising this discretion, the FCC has given the exemptions "rather full sway." *Kennedy for President Com. v. FCC*, 636 *F.*

---

afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: *Provided*, That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is imposed upon any licensee to allow the use of its station by any such candidate. Appearance by a legally qualified candidate on any—

    (1) bona fide newscast,

    (2) bona fide news interview,

    (3) bona fide news documentary (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or

    (4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto),

shall not be deemed to be use of a broadcasting station within the meaning of this subsection. Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.

    (b) The charges made for the use of any broadcasting station for any of the purposes set forth in this section shall not exceed the charges made for comparable use of such station for other purposes.

    (c) The Commission shall prescribe appropriate rules and regulations to carry out the provisions of this section. [47 *U.S.C.* § 315]

2d 417, 423 (D.C.Cir.1980). Thus, in rejecting Ann Klein's petition for inclusion in the "Closer Look" forum on the issues, the FCC wrote:

> In order to encourage uninhibited news coverage, the Commission believes its appropriate role in this area requires deferring to the good faith news judgments of broadcasters. To this end, the Commission will not substitute its judgment for that of the broadcaster, but rather will disturb such decisions only when they are found to be unreasonable or in bad faith. This policy is applicable to broadcasters' determinations of whether particular programming falls within any of the news exemptions, as well as journalistic judgments concerning what material should be presented in news programming. [*Ann Klein*, Docket No. 8330–B, C5–860 at 3 (5/29/81)]

Simply stated, the FCC policy is to leave it to the individual broadcasters to determine the degree to which the equal opportunity rule should be enforced in news broadcasting. This policy determination by the FCC derives from its determination not to risk inhibiting active news coverage.

### 2. *Pre-emption*

The Authority argues that § 315 pre-empts any state provisions which impose upon broadcasters greater equal opportunity obligations than the FCA, as construed by the FCC, imposes. State law is pre-empted in one of two situations: (1) where "Congress has either explicitly or implicitly declared that the states are prohibited from regulating" in this area, *Ray v. Atlantic Richfield Co.*, 435 *U.S.* 151, 157, 98 *S.Ct.* 988, 994, 55 *L.Ed.*2d 179 (1978) or (2) where a state statute "actually conflicts with a valid federal statute." *Id.* at 158, 98 *S.Ct.* at 994. The test for determining whether actual conflict exists is "whether, under the circumstances of [a] particular case, [the state's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 *U.S.* 52, 67, 61 *S.Ct.* 399, 404, 85 *L.Ed.* 581 (1941), quoted in *Jones v. Rath Packing Co.*, 430 *U.S.* 519, 526, 97 *S.Ct.* 1305, 1310, 51 *L.Ed.*2d 604 (1977).

Were this a case involving a privately owned broadcasting station, the pre-emption issue would be more difficult to resolve. The state mandate to cover elections with "balance, fairness and

equity," though not *prima facie* inconsistent with § 315, represents an emphasis that differs from the high degree of deference which the FCC gives to its licensees.

The New Jersey Public Broadcasting Authority, however, is not a private broadcaster. Rather, it is an instrumentality of the State of New Jersey. It is owned and financed by the State of New Jersey, and its officers are appointed directly or indirectly by the Governor. This simple fact is dispositive of the pre-emption issue.

In *K.S.B. Tech Sales v. No. Jersey Dist. Water Supply*, 75 N.J. 272 (1977), and *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976), this Court and the United States Supreme Court held that the Commerce Clause does not apply to a state acting as purchaser of goods rather than as regulator of private purchases. As Justice Stevens explained in his concurring opinion in *Hughes*:

> It is important to differentiate between commerce which flourishes in a free market and commerce which owes its existence to a state subsidy program. Our cases finding that a state regulation constitutes an impermissible burden on interstate commerce all dealt with restrictions that adversely affected the operation of a free market. This case is unique because the commerce which Maryland has "burdened" is commerce which would not exist if Maryland had not decided to subsidize a portion of the automobile scrap-processing business. [*Id.* at 815, 96 *S.Ct.* at 2500, quoted in *K.S.B. Tech Sales, supra*, at 296]

While the state as regulator is prohibited from discriminating against out-of-state commerce, the state as purchaser has the same freedom as a private citizen to choose with whom it will engage in commerce.[13] Thus, in *K.S.B. Tech Sales*, this Court upheld a statutory requirement that contractors with the State or local governments buy only American products.

---

[13]This, of course, assumes that this freedom is exercised in pursuit of a proper state purpose under the police power. We do not mean to imply that the State could permissibly limit its purchases, for example, to business owned by white persons. Writing for a unanimous Court, Justice Schreiber stated in *K.S.B. Tech Sales, supra* at 298, "[t]he state legislation which is so sanctioned would seem to include those acts designed to further *economic interests or other legitimate ends*, such as public health and welfare." (Emphasis added)

The principle is the same in this case. In terms of federal pre-emption, the State of New Jersey can be viewed as acting here in its capacity as proprietor of the Public Broadcasting Authority stations rather than in its capacity as regulator of private broadcasting. Under Federal law, the FCC has granted broad discretion to the owners of licensed television stations to design the election coverage of their stations. The State, considered as owner of the four stations that constitute the Public Broadcasting Network, in effect has used this discretion granted by Federal law by deciding that coverage shall be characterized by "balance, fairness and equity." Viewed in this light, such a determination is not contrary to Federal law; indeed, Federal law gives New Jersey the authority to make such a determination.

It follows, in this context, that *N.J.S.A.* 19:44A–39 is not a governmental restraint upon a broadcast medium. Rather, it constitutes an exercise of discretion on the part of the State in its capacity as a Federal licensee under the FCA.[14] Thus, since the statutes in question were passed *pursuant to*, rather than in conflict with, the FCA, the statutes are not pre-empted by the FCA.

The FCC policy of granting maximum discretion to individual broadcasters has freed New Jersey to adopt a policy for election coverage that addresses the Authority's unique situation. Because of the absence of adequate coverage of New Jersey elections by the private stations, the voters of New Jersey are largely dependent upon public television to provide election information. Therefore, the State has assured that New Jersey public television will fill the need by calling for promotion of

---

[14]The statute is no different than a resolution which might be passed by the board of directors or the shareholders of a private station owner determining how that station should cover elections. No federal policy would in any way be undermined if a private station were to resolve to cover elections with balance, fairness and equity as among candidates. The same principle adheres to the State's exercise of its prerogatives as an owner.

"full discussion of public issues by the candidates." However, again because of the inadequacy of private coverage of New Jersey gubernatorial elections, the Authority's position approaches that of a monopoly. This position suggests an obligation to be balanced and fair in election coverage which exceeds the duty on stations regarding elections which may be adequately covered by private broadcasters. Moreover, the special danger of improper influence on election coverage that is faced by a government-owned station militates in favor of greater emphasis on balanced coverage. The Legislature has responded to these needs by placing a greater emphasis on balanced coverage than the FCC requires of a licensee.

In sum, the FCA, as construed by the FCC, does not preclude balanced election coverage; rather, it gives licensees the freedom to determine how strongly they wish to stress balance in their election coverage. New Jersey has acted pursuant to that freedom, taking into account the special position of the Authority vis-a-vis New Jersey gubernatorial elections, and has determined that its election coverage should be balanced, fair and equitable, and it has done so pursuant to Federal law. Its actions are perfectly appropriate within the federal scheme of regulation. We therefore hold that the FCA does not pre-empt the State statutory scheme concerning election coverage by the Authority.

■ This conclusion flows from the premise that the Authority can for present purposes be regarded as an agency of the State.[15] Nevertheless, even if the Authority were more appropriately characterized as an autonomous entity, we would still reach the same result with respect to the impact of Federal law.

---

[15]The Authority is unlike the New Jersey Sports and Exposition Authority and the New Jersey Highway Authority which are autonomous bodies. For example, they have the statutory right to issue bonds and to sue and be sued—powers which the Authority lacks.

As previously noted, state regulation is fully pre-empted only in those areas in which the federal interest is so dominant that it leaves no room for conflicting State involvement. *Ray, supra,* 435 *U.S.* at 157, 98 *S.Ct.* at 994. There can be no question that through the FCA and the creation of the FCC, Congress has developed a comprehensive federal scheme for addressing broadcast regulation problems. However, that scheme is not so comprehensive as to exclude all State involvement. *See Head v. New Mexico Bd. of Examiners in Optometry,* 374 *U.S.* 424, 83 *S.Ct.* 1759, 10 *L.Ed.2d* 983 (1963) (Court upheld State advertising regulations challenged on grounds of federal pre-emption under the FCA). Rather than pre-empt the field, federal law permits reasonable State regulation which is not repugnant to or inconsistent with the federal approach. Therefore, State law must stand where "there has been no showing of any conflict between . . . State law and the federal regulatory system." *Id.* at 432, 83 *S.Ct.* at 1764.

The State statutory scheme under which the Authority functions is neither repugnant to nor inconsistent with federal law. As we have explained, Congress in 1959 was faced with an apparent conflict between its desire to encourage wide-ranging political coverage and debate on the airwaves and its goal of equalizing opportunity to receive access to radio and television time among candidates for elective office. Congress, and the FCC in construing the Congressional intent, have tipped the scales substantially towards volume of news coverage, sacrificing equality if necessary.[16]

In the case of New Jersey public television, the conflict between quantity and balance does not arise with nearly the same force. New Jersey has resolved that its television stations will provide both a high level of coverage and a balance among the candidates. Nobody has ever suggested that it is impossible

---

[16]It should be noted, however, that the "equal opportunity" provision remains part of federal law and serves at least as an exhortation to broadcasters to take equality into consideration.

to do both. The Congressional fear in 1959 was that "equal opportunity" would deter private broadcasters from providing any election coverage. That danger is simply non-existent in this instance, since *N.J.S.A.* 19:44A–39 places a legal duty on the Authority to promote full discussion of the issues. We have no doubt that the Authority can carry out that mandate in a spirit of "balance, fairness and equity." [17] Consequently, there is no conflict between the State regulatory scheme and the terms or goals of the FCA.

### B. *The First Amendment*

Appellants and *amici* suggest that any State regulation constraining the Authority's journalistic discretion conflicts with the Authority's First Amendment rights. As with the pre-emption argument, however, plaintiffs' contention that the First Amendment bars the Legislature from mandating fairness is without force in the context of a television network owned and controlled by the State. The Authority is the State's agent, and its power, limitations and restrictions have been prescribed by the State. To contend that the agent is not bound by those statutory provisions because of the First Amendment would be anomalous indeed.

The First Amendment limits governmental restraints on *private* participation in the marketplace of ideas. However, it does not prevent government itself from participating, *Community-Service Broadcasting, Etc. v. F.C.C.*, 593 F.2d 1102, 1110, n.17 (D.C.Cir.1978); L. Tribe, *American Constitutional Law*, 588–90 (1978), and when the State exercises its freedom to

---

[17]We recognize that a precise equal time requirement would make it very difficult for the Authority to carry out this obligation. However, as will be developed *infra*, the New Jersey statutory scheme does not impose a precise equal time provision. Rather, it is an injunction to the Authority that its overall election coverage reflect fairness as among the candidates. In light of the 1981 amendment to *N.J.S.A.* 19:44A–39, it is clear to us that this injunction was meant to be carried out in a spirit of reasonableness and flexibility.

speak, it may express its own viewpoint, *Community-Service Broadcasting, supra,* at 1110, n.17; Tribe, *supra,* at 590, or it may neutrally relay the messages of others. The goal of the New Jersey statutory scheme is to use the State television network to neutrally relay the messages of the candidates for governor of New Jersey.

Appellants' First Amendment argument incorrectly relies upon case law concerning private broadcasters and newspapers. *See, e.g., Miami Herald Publishing Co. v. Tornillo,* 418 *U.S.* 241, 94 *S.Ct.* 2831, 41 *L.Ed.2d* 730 (1974); *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 *U.S.* 94, 93 *S.Ct.* 2080, 36 *L.Ed.2d* 772 (1973); *National Association of Independent Television Producers and Distributors v. F.C.C.,* 516 *F.* 2d 526 (2d Cir. 1975). Two other cases, *Accuracy in Media, Inc. v. F.C.C.,* 521 *F.2d* 288 (D.C.Cir.1975), and *Community-Service Broadcasting, supra,* also relied upon by appellants, involve public support for private non-commercial broadcasting and are therefore also not pertinent. These cases state in essence that Congress cannot condition receipt of such support by *private* recipients on acceptance of restraints on speech that Congress could not impose directly. *Community-Service Broadcasting, supra,* at 1110. The concern there is limiting governmental restraint on the *private* recipients of government assistance. Here, by contrast, no private speech is being limited. Thus the State statutes here are not laws abridging speech and they do not invade the First Amendment rights of any citizen.

We therefore affirm the constitutionality of *N.J.S.A.* 19:44A–39, *N.J.S.A.* 48:23–7(h) and *N.J.S.A.* 48:23–9.[18]

---

[18]*But* cf. Muir v. Alabama Television Commission, supra, *wherein the Fifth Circuit Court of Appeals rejected claims by individual viewers of Alabama public television that they had a First Amendment right to see "Death of a Princess," which the Alabama Educational Television Commission scheduled for showing but then removed.*

Although the holding in that case merely concerns the First Amendment rights of viewers to compel the telecasting of specific programs, *Muir* includes language, in *dictum,* making reference to the First Amendment

Thus far, we have held that the New Jersey statutory scheme, consisting of *N.J.S.A.* 48:23–7(h) and –9 and *N.J.S.A.* 19:44A–39, obligates the Authority to promote full discussion of the issues by the gubernatorial candidates in a spirit of balance, fairness and equity as among the candidates. We have further held that the New Jersey statutes, thus construed, are not pre-empted by the Federal Communications Act or proscribed by the First Amendment. It remains for us to consider in detail the meaning of "balance, fairness and equity" and to apply it to the case at hand.

V

We start with a basic proposition: there is no equal time requirement under the statute. *N.J.S.A.* 19:44A–39 does not include the words "equal time." To read a strict minute-for-minute equal time provision into the Act would be unwarranted judicial legislation. The balance and equity principle was not intended to reinstate for the Authority the defunct equal time rule. It is rather a general admonition to assure that the Authority's election coverage over the course of the campaign is not on the whole unfair to any candidate. Further, the clear import of the 1981 amendment to *N.J.S.A.* 19:44A–39 is that this admonition not be construed strictly or inflexibly. Rather, it is to be read in a spirit of reasonableness. That amendment also indicates that the staff of the Authority has been delegated a significant degree of discretion in carrying out this mandate of fairness.

---

rights of state-owned television stations. However, that case involved a conflict between a public agency acting within its statutory authority and private citizens seeking to reverse the agency's discretionary determination and to compel the broadcast of a specific program.

Here, by contrast, the Authority seeks to assert a First Amendment right to act contrary to its statutory authority. The Fifth Circuit in *Muir* did not address this situation.

We note that even in the situation faced in *Muir*, Judge Clark dissented, basing his conclusion on the fact that "[t]he licensee is a creature of the State of Alabama." 656 *F*.2d 1012 (5th Cir. 1981).

*N.J.S.A.* 19:44A–39 also makes reference to "federal law." As we have held, we do not believe the reference indicates an intent that federal law supplant state law. Nor do we believe the Legislature intended to repeal or modify *N.J.S.A.* 48:23–7(h) and 48:23–9. To the contrary, we construe *N.J.S.A.* 19:44A–39 to mean that the State mandate of balance and fairness should be read in conjunction with the relevant Federal Communications Act provisions. While federal law was not meant to supersede the state provisions, it was meant to be taken into account, to be read *in pari materia* with the state provisions. *See* Sponsor's Statement, *L.*1981, *c.* 107. The statute does not give an express formula for construing the state provisions in the light of the FCA. We believe, however, that the Legislature contemplated the special treatment given to *bona fide* news programs under § 315 which exempts such coverage from the "equal opportunity" provisions.

We therefore conclude that the Authority has been given a higher degree of discretion regarding newscasts, news interviews, news documentaries and coverage of news events. This does not mean that the fairness mandate is obviated in those instances. The Legislature did not intend the FCA to supersede the State provision. Rather, the Authority should be given wider leeway to implement its journalistic judgment in those areas, but its exercise of discretion is still constrained by the duty to provide balance, fairness and equity in its coverage of candidates.

Of course, "newscast," "news interview," "news documentary" and "news event" are not self-defining terms. The FCC has developed rather elaborate case law defining these terms. For the FCC, it has been necessary to try to develop a sharp distinction between what those terms cover and what they do not, since the triggering of the equal opportunity rule turns on the application of that distinction. No such sharp distinction is necessary here since under New Jersey law all programming—news or otherwise—remains subject to the fairness mandate.

Instead, the Authority should be guided by a rule of reasonableness in light of the type of program involved. Some programs are clearly news, others are clearly debates, and still others fall somewhere between those two categories.[19] The greater the news content of a given program, the more the Authority can feel free to allow its journalistic judgment to guide its actions.

The Legislature has provided us and the Authority with general principles rather than specific rules of law. We are not prepared at this point, on the basis of only one case, to seek to deduce detailed rules from these general principles. More importantly, we are convinced that the Legislature did not wish the courts to set forth detailed rules. It has stated that the Authority is to be given substantial discretion in abiding by the legislative mandate; laying down a set of detailed guidelines would be a violation on our part of the Legislature's intent. It would also pre-empt the Authority's rule-making power.

Thus, we hold that the New Jersey Public Broadcasting Authority has a statutory duty to promote full discussions of public issues by gubernatorial candidates and to do so with balance, fairness and equity. This duty does not impose the constraints of strict equal time programming. The touchstone is

---

[19]We believe that the instant case falls into this third category. "A Closer Look" is part of a regular news program and apparently is generally used to present news features. However, in this instance, the program consisted of recorded statements by the candidates, which constituted news only in the sense that statements by candidates one week before an election are always news.

We realize that the FCC classified this program as a "newscast" in its *Ann Klein* decision. Docket No. 8330–B, C5–860 (5/29/81). However, because of the structure of § 315, the FCC had to make a yes-or-no decision as to whether this broadcast fit into one of the exemptions. Given the FCC's policy of maximizing broadcaster discretion, it chose a more expansive construction of the exemptions. We are examining the broadcast under different circumstances, with different constraints, and for purposes of applying a different statute. It should therefore be neither surprising nor troubling that we adopt a slightly different view as to the nature of the "Closer Look" forum on the issues.

basic fairness, and the Authority is to have substantial discretion to determine what is fair in light of its journalistic judgment. This discretion is to be even wider in the case of newscasts, news interviews, news documentaries and coverage of news events. A candidate wishing to challenge the Authority's coverage of a gubernatorial campaign will be required to prove that the Authority's coverage, examined over the entire course of the campaign, has been or threatens to be unreasonably imbalanced.

## VI

We now turn to the claims raised by plaintiffs. They did not allege that the Authority's overall coverage of the election campaign was unfair or imbalanced. Rather, they alleged that the Authority unfairly excluded them from a week-long forum on the issues to be aired during the potentially pivotal final week of the primary campaign. They asserted that this was unreasonable and contrary to New Jersey law. The case came to us on an emergent basis, denying us the time to fully and carefully explicate the statutes at issue, which had not been previously construed by this Court. Our initial reading of the New Jersey statutes revealed a requirement of balance and fairness in the coverage of gubernatorial campaigns. The challenged exclusion of candidates McGlynn and Rafferty from an important election program during the final week of the campaign appeared to violate the fairness requirement. For that reason, we affirmed the Appellate Division order that all candidates on the ballot for the Republican gubernatorial nomination be included in the "Closer Look" forum.

We emphasize now that the statute governing the Authority, designed to promote the public interest, does not confer on an individual candidate a *right* to be included in any given program or series of programs. His only right is to fairness, balance and equity in the *entirety* of the Authority's election coverage over the course of the campaign. With the benefit of added oral and written argument upon the rehearing, we find adequate support

in the record that the Authority's overall coverage of the gubernatorial primary campaign was fair, even without including the plaintiffs in the final week's "Closer Look" forum. The decision to exclude plaintiffs was a reasonable exercise of the broad discretion vested in the Authority to make editorial judgments in accordance with Federal and State law.

We confess to total puzzlement at the dire predictions made by our concurring colleagues that our decision today · has wrought a broadcasting holocaust. The imprecation of such a journalistic calamity is difficult to fathom since we reach precisely the result called for by the concurring opinions—one which recognizes the generous freedom enjoyed by the Authority under Federal and State law and its proper exercise in this case.

The Cassandra-like tone of the concurring opinions, it seems to us, is exaggerated. They fail to credit the Judiciary with common sense and an appreciation of the importance of the role of the Authority. We do not envisage any supervisory role by the Judiciary in the broadcast field. We expect that judicial involvement will be rare, and judicial review fully responsive to the freedom of action which the Legislature has given the Authority.

We note that the Authority continues to possess delegated power to promulgate rules and regulations to give specific content to the broad legislative mandate. The Authority is urged to implement its rule-making authority to provide guidance in this area.

For the foregoing reasons, upon rehearing, the Court clarifies its earlier determination and reverses its summary order. The judgment of the Superior Court, Appellate Division, is reversed and the complaint is dismissed.

WILENTZ, C. J., concurring.

We reached the same result as the majority in this case, but the difference between us is fundamental. That difference, we

believe, is of critical importance to the future of New Jersey public television. We would not add State regulation of broadcast content by New Jersey's judges to the present federal regulation; we would not impose another restraint on this station's journalistic freedom. This majority would.

All television stations in the United States, in covering the activities of candidates, are subject to a comprehensive body of federal regulations embodied in the Federal Communications Act, 47 *U.S.C.* §§ 151 to 609, and in the Federal Communication Commission's interpretations of that Act. *See, e.g., New Primer on Political Broadcasting and Cablecasting,* 69 *FCC* 2d 2209 (1978); *Use of Broadcast Facilities by Candidates for Public Office,* 24 *FCC* 2d 832 (1970).

The majority holds that the Legislature intended to subject New Jersey's public television network to additional regulations in its campaign coverage in the form of requirements imposed by the State over and above those imposed by the federal statutory scheme. We respectfully disagree with the majority's conclusion that the Legislature intended to burden our public broadcaster with more than the federal requirements.

The legislative history of *L.*1981, *c.* 107, *N.J.S.A.* 19:44A–39, admits of but one conclusion: the Legislature intended the New Jersey Public Broadcasting Authority, in its operation of New Jersey's public television network, to be subject only to federal laws and rules in its coverage of candidate activities. If added regulations are needed, it is for the Legislature to impose them, not this Court.

The basis for our conclusion is that the Legislature in the most explicit language, has directed that all such claims be determined "in accordance with federal law"; implicit in this direction is the requirement that all such complaints be handled by the Federal Communications Commission and the federal courts, and not by any New Jersey agency or any New Jersey court. It is clear that Mr. McGlynn's claim would have been denied under federal substantive law. *See In re Ann Klein,* Docket No. 8330–B, C5–860 (5/29/81).

While the majority does not explicitly base its holding on the desirability of such added restraints by the State, there are numerous references to factors apparently used by the majority to support its conclusions as a matter of good policy.[1] While these policy considerations are ordinarily matters of concern solely to the Legislature, they are at times valuable aids in construing legislation. In this case, however, the legislative intent is so clear that such policy considerations should play no part in the Court's decision. Furthermore, we have very serious doubts about the wisdom of the policy of increased state control that forms some part of the majority's thinking.

I.

The Act establishing the Public Broadcasting Authority and authorizing the operation of a TV network was adopted in 1968 to become effective at the beginning of 1969. *L.*1968, *c.* 405, *N.J.S.A.* 48:23–1 *et seq.* That Act contains not one word about candidate coverage, except for the language, relied on by the majority, prohibiting the Authority "from supporting or opposing any political party or candidate for public office, elective or otherwise...." *N.J.S.A.* 48:23–9. This is not the language of equal time or fair coverage, either on its face or in light of its history. The prohibition against supporting or opposing any political party or candidate derives most immediately from the recommendations of the Governor's Commission on Public Broadcasting for New Jersey, contained in its report of May 1968. Governor's Commission on Public Broadcasting, *Report and Recommendations to New Jersey Citizens* (May 1968). The Commission envisioned the Public Broadcasting Authority as an independent entity in which direct government involvement should be kept to a minimum, an entity insulated from political

---

[1] Most notably, the majority repeatedly stresses the desirability of its result in light of New Jersey's lack of alternative statewide broadcast services, and the unique position of NJPTV in regard to the State's total population of viewers. *See* 88 *N.J.* 121–23, 124–25, 126, 139–40.

interference and entanglements. *Id.* at 29. In light of this conception of the public broadcasting entity as a nonprofit and nonpolitical creature, the Commission recommended that it "should be prohibited from supporting or opposing any political party or candidate for public office, elective or otherwise, and from attempting to influence legislation." The Legislature adopted this language virtually verbatim, suggesting that it concurred with the Commission that the public broadcast stations should . be removed from the vicissitudes of politics in determining its broadcast content. The prohibition against endorsing candidates was part of a design intended to free the public broadcast authority from government control and not, as the majority suggests, part of a legislative plan to impose upon the Authority judicially enforceable fairness requirements in coverage of the gubernatorial race. Had the Legislature intended any such obligation, it could easily have selected the model of the Federal Communications Act, which had been on the books for several years. The construction that transforms this prohibition against endorsements into a mandate for fair coverage is without justification.

The majority's reading of this provision (Section 9) of the Public Broadcasting Authority Act as a basis for its conclusion seems even more unlikely in light of a second apparent source of that section's language prohibiting political endorsements and lobbying. *N.J.S.A.* 48:23–9. In 1967 Congress passed an act · establishing the Corporation for Public Broadcasting (CPB), 47 *U.S.C.* §§ 396–399. This act, the acknowledged model for the public broadcasting corporation recommended by the Governor's Commission, *see Report and Recommendations to New Jersey Citizens, supra,* at 10, provides first, in Section 396(f)(3), that the CPB "may not contribute to or otherwise support any political party or candidate for elective public office." Similarly, in Section 399(a) of the CPB Act, Congress mandated that "no noncommercial educational broadcasting station may engage in editorializing or may support or oppose any candidate for public

office." A "noncommercial educational broadcasting station" is defined in the Act as

> a television or radio broadcast station which—
>
> (A) under the rules and regulations of the Commission in effect on the effective date of this paragraph, is eligible to be licensed by the Commission as a noncommercial educational radio or television station and which is owned and operated by a public agency or nonprofit private foundation, corporation, or association; . . . . [47 *U.S.C.* § 397(6)(A) ].[2]

The New Jersey Public Broadcast stations are within this definition and are therefore forbidden by Section 399(a) to engage in editorializing or political endorsement. The significance of this prohibition is illuminated by the Conference Committee report on the legislation that was to become the CPB Act:

> The House amendment contains provisions which would prohibit any noncommercial educational broadcast station from engaging in editorializing or supporting or opposing any candidate for political office. The Senate bill contains no comparable provisions.
>
> The managers on the part of the Senate accepted the House provisions when it was explained that the prohibition against editorializing was limited to providing that no noncommercial educational broadcast station may broadcast editorials representing the opinion of the management of such station. It should be emphasized that these provisions are not intended to preclude balanced, fair, and objective presentations of controversial issues by noncommercial educational broadcast stations. [Conference Report No. 794 to accompany S.1160, *reprinted at* 1967 *U.S.Code Cong. & Ad.News* 1772, 1834, 1835].

Thus, by virtue of Section 399 of the Corporation for Public Broadcasting Act, all noncommercial stations are subject to a ban on political endorsements similar to that in Section 9 of the Public Broadcasting Authority Act. Furthermore, it is clear from the legislative history of Section 399 that Congress anticipated that controversial issues would be presented, consistent with the ban on editorializing, in a balanced, fair, and objective manner. Yet it has never, until now, been suggested that Section 399 (practically identical to Section 9 of our Act) adds some requirement of equal or fair coverage of political elections

---

[2]Under this definition of a "noncommercial educational broadcasting station" both public and private educational broadcast stations may benefit from the activities and grants of the Corporation for Public Broadcasting.

to that already imposed on broadcasters by Section 315 of the Federal Communications Act, 47 *U.S.C.* § 315. It seems unlikely that the New Jersey Legislature, in following the federal example, intended such a radically different interpretation of the borrowed language without explicit direction to that effect.

The majority also finds support for its holding in Section 7(h) of the Public Broadcasting Authority Act, which provides that the Authority shall have the power to:

> h. Assume responsibility for the character, diversity, quality, and excellence of programming which is released via its licensed facilities, provided that programs or series of programs of a controversial nature shall be presented with balance, fairness and equity; [*N.J.S.A.* 48:23–7].

Once again, the source of this language appears to be the CPB Act. In Section 396(g)(1)(A), the CPB is empowered to:

> (A) facilitate the full development of public telecommunications in which programs of high quality, diversity, creativity, excellence, and innovation, which are obtained from diverse sources, will be made available to public telecommunications entities, with strict adherence to *objectivity and balance* in all programs or series of programs of a controversial nature; [emphasis added].

The meaning of this language of objectivity and balance has not been explicated by any decisions of the FCC or the federal courts, but this in itself is significant. In *Accuracy in Media, Inc. v. F. C. C.*, 521 *F*.2d 288 (D.C.Cir.1975), the court affirmed a ruling of the FCC that the FCC lacked jurisdiction to enforce the "objectivity and balance" mandate of Section 396(g)(1)(A). The court read Section 396(g)(1)(A) as a guide to Congressional oversight policy and as a set of goals to which the Directors of CPB should aspire. "The provision is not a substantive standard legally enforceable by agency or courts." 521 *F*.2d at 297. *See also The Network Project v. Corporation for Public Broadcasting*, 561 *F*.2d 963 (D.C.Cir.1977) (federal *courts* have no power to enforce 47 *U.S.C.* § 396(9)(1)(A)). We similarly decline to read Section 7(h) as a standard enforceable in the courts of this state. It is quite clear that the "balance, fairness, and equity" language of Section 7(h) does not concern candidate coverage, but rather, like its federal counterpart, it is intended as a guide for the PBA to follow in its coverage of issues and ideas and policies.

From 1971 when the Authority commenced operations of its stations, to 1977 no complaint was filed either with the FCC, the Authority, the courts, or anyone else, as far as we know, asserting that the Act contained any requirements whatsoever concerning candidate coverage.[3] With thousands of mayors, councilmen, freeholders, legislators, and even governors running for office, one would have thought that someone would have read this statute in the same manner as the majority and brought an action based on it. It was, however, and is a statute simply devoid of requirements concerning campaign coverage, and everyone knew it. It is not as if this were some abstruse piece of legislation tucked away in the crevices of the Federal Communications Act or its interpretations. This was New Jersey's own statute, New Jersey's own television station, and one might have expected aggressive pursuit of that station with allegations of failure to do "basic fairness" to particular candidates if any such obligation existed.

Failure to include requirements for candidate coverage was not the result of legislative inadvertence. There apparently was no perceived need for it. The station was already subject, as are all television stations, to the provisions of the Federal Communications Act and its many regulations including those concerning candidate coverage. The Legislature presumably concluded that NJPTV needed no more regulations than those applicable to all other stations.

That situation changed in 1974. During that year, the Legislature passed a law providing for the partial public financing of the gubernatorial general election. *L.*1974, *c.* 26. Section 14 of that Act, *N.J.S.A.* 19:44A–1 *et seq.*, contained the first obligation, other than the prohibition against political endorsements, imposed upon the Authority by the Legislature concerning can-

---

[3]The year 1977 is used simply because we are aware of an unreported Appellate Division decision in which the Act was apparently relied upon by a gubernatorial candidate as the basis for a claim against the Authority's stations on a "fairness" theory.

didate coverage.[4]  It required the Authority to "promote full discussions of public issues by the candidates for the office of governor ... free of charge to any such candidate." *N.J.S.A.* 19:44A–39.  Prior to the enactment of that section, and the language just quoted above, the only reference to "full discussions of public issues" was a clarifying statement in the Act of 1968 to the effect that the prohibition against candidate endorsement was not to be construed as precluding the station "from promoting full discussions of public issues."  By virtue of *N.J.S.A.* 19:44A–39, this was transformed into an *affirmative* obligation to promote such discussions, and now the discussions were to be "by the candidates."  The notion of "basic fairness" or "fair treatment" of candidates, so easily expressed if intended, is nowhere to be found in that sentence.  There is a specific obligation, however, that follows, for the station by that same section was specifically required to afford *at least* one hour of TV time for each candidate and one hour for all appearing together.  Again it would have been quite simple in *that* sentence to indicate some obligation of fairness where more than one hour was to be supplied, but the Legislature declined to do so.  Once the one hour requirements were complied with, that statutory section was satisfied, and the station was free to cover candidates as it saw fit, subject, as were all other stations, to federal law and regulations.

We agree with the majority that this new requirement was directly related to the public financing law, *N.J.S.A.* 19:44A–1 *et seq.*, of which it was a part.  Like the majority, we are convinced that the Legislature, having decided to expend public funds to make it easier for gubernatorial candidates to run,

---

[4]*Cf.* 47 *U.S.C.* § 312(a)(7), which specifically protects the access of *federal* candidates to broadcast time:  the section provides that the FCC may revoke a station's license

(7) for willful or repeated failure to allow reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting station by a legally qualified candidate for Federal elective office on behalf of his candidacy.

wanted to make their entry into the campaign realistic by guaranteeing at least a minimum amount of free TV time on New Jersey's own stations. Other than that minimum guarantee however, no more was provided: neither equal time, nor some notion of "fair treatment."

The 1974 law set the pattern for providing requirements for campaign coverage of the Authority in the election laws, rather than in the PBA Act. In 1980 the Legislature passed a law providing for the partial public funding of gubernatorial *primaries*. *N.J.S.A.* 19:44A–3(m)(1)(3). The law became effective on July 23, 1980. The Legislature, apparently realizing that the number of candidates in the primary from both major parties would be substantial, reduced the individual time coverage requirements in the primary as compared to the general election from one hour to 15 minutes, but doubled the joint appearance requirement to two hours. Each candidate in the primary, therefore, knew that he or she was entitled to at least 15 minutes of individual coverage and that he would participate in a joint appearance with all other candidates (of his or her party) of at least two hours' duration.[5] The general obligation contained in the first sentence, that the Authority should promote full discussions of all issues by the candidates, was extended to the primary, but the specific obligation was different. Again, it seems quite clear that once the minimum obligation of 15 minutes for each candidate and two-hour joint appearances had been satisfied, the Authority was free to provide additional coverage as it saw fit—subject always to federal law.

Obviously the Legislature had reduced the one hour of required time for each candidate to 15 minutes because it believed

---

[5]The two-hour joint appearance provision is somewhat ambiguous but seems to have been intended, and was apparently so construed by the Authority, to require a joint appearance of all candidates from one party of two hours, and another two hour joint appearance of all candidates from the other party. There were no primaries for any other than the two major parties.

that with so many primary election candidates, the one-hour provision would constitute an unreasonable burden on the station. It also must have known that the station, unless restrained, might afford the front-runners much more than 15 minutes each and minor candidates much less. It did not attempt, however, to require equality in any time allocated to a candidate above 15 minutes, nor did it impose any "fairness" requirements on such excess coverage.[6]

Apparently even this seemingly modest requirement was deemed oppressive by the Authority for in 1981, with the primary campaign warming up, and with the possibility of 20 to 30 candidates running, the Authority sought to have legislation introduced relieving it completely of this specific hourly commitment, both for individual appearances and joint appearances. Obviously whatever discretion the law then gave the station was not deemed enough. The bill as introduced (S.3059, introduced on January 26, 1981) eliminated all obligations for providing specific time coverages for individual candidates and for joint appearances in both the primary and general election for governor, leaving only the general obligation to "promote full discussions of public issues by the candidates" in both the primary and general election. This general obligation, however, which was all that remained in the section, was qualified by the new language "in accordance with law" and, as before, "free of charge to the candidates."

The station was thus left with the general obligation to promote full discussions of public issues "in accordance with law," and the sponsor explained, in his attached statement, that the "bill would direct the New Jersey Public Broadcasting Authority to provide coverage of the gubernatorial primary and general election campaigns and give the Authority the discretion, within the limits of *federal and state* law, as to the manner

---

[6]The change of equal time requirements from one hour per candidate in the general to 15 minutes in the primary clearly implies that if the station were able to provide additional time for candidate coverage, it need not be equal.

in which it does so" (emphasis supplied). Obviously the sponsor was drawing a distinction between the direction of the Legislature—to provide coverage—and the discretion of the Authority—to determine the *manner* in which it would provide such coverage. That discretion, however, was to be "in accordance with law," the sponsor indicating by his statement his intention that those words meant in accordance with federal *and* state law.

The issue before this Court was decided once and for all by the Senate committee to which this bill was referred. It amended the legislation by inserting the word "federal" into the phrase, so that the discretion which the Authority was given as to the manner in which it would promote full coverage was limited only "in accordance with *federal* law" (emphasis supplied).

No legislative intent could be more clearly spelled out. Faced squarely with the question of whether the discretion of the Authority should be limited by both federal and state law, the Senate committee decided that it should not, that the only limitation on the Authority's discretion should be federal law.[7] The statement issued by the Senate committee is consistent with its obvious intent. It noted that the bill permitted the Authority "a greater degree of flexibility in the promotion of the discussion of public issues by gubernatorial candidates in the primary and general election campaigns.[8]

---

[7] The majority (at 128) refuses to face or even admit the indisputable fact that while the *sponsor*, in his statement accompanying the bill as originally introduced, referred to federal *and state* law, the *Legislature, thereafter*, through its committee, changed the bill, obviously because of the sponsor's statement, so that "in accordance with law" (in the sponsor's bill) became "in accordance with *federal* law" (emphasis added).

[8] The Legislature's intent in changing the wording of the statutory language is entitled to great deference. It is widely recognized that changes in the wording of a bill, whether accepted or not, may serve as an important guide to understanding what was passed. "As with respect to amendments to bills, comparison of different provisions on which a conference is held, and knowl-

The Governor noted, upon signing the bill, that it would "give the New Jersey Public Broadcasting Authority maximum discretion, within federal law, in its coverage of the gubernatorial primary and general election.... [It] removes any specific time restraints and allows NJPTV to operate under FCC guidelines." In approving a bill passed by the Legislature the Governor may be perceived as acting in a legislative capacity and as part of the legislative branch of the state government. His action upon a bill may therefore be considered in determining legislative intent. *Lynch v. State,* 19 *Wash.*2d 802, 145 *P.*2d 265, 269 (1944); *Shelton Hotel Co. v. Bates,* 4 *Wash.*2d 498, 104 *P.*2d 478, 481 (1940); *see also* 2A C. Sands, *Sutherland, Statutory Construction* (4th ed. 1973) § 48.05.

The clarity of this legislative action is such as to render irrelevant the issue of whether the Act through Section 7(h) or Section 9 contained requirements concerning candidate coverage, or whether the first sentence of *N.J.S.A.* 19:44A–39 imposed some obligation of fairness or equality. Even if we are wrong in our belief that it is unreasonable, and constitutes a perversion of the language and intention of those sections, to construe them as imposing candidate coverage obligations, we cannot be wrong in our conclusion that *N.J.S.A.* 19:44A–39 is explicitly addressed to that subject. The Legislature having

---

edge of the action taken in regard to them, may help to understand the [final] version." 2A C. Sands, *Sutherland, Statutory Construction* (4th ed. 1973) § 48.04 at 198. For cases recognizing that a change in language is a substantial factor in arriving at legislative intent, *see United States v. Universal C. I. T. Corp.,* 344 *U.S.* 218, 73 *S.Ct.* 227, 97 *L.Ed.* 260 (1952); *Raybestos-Manhattan Inc. v. Glaser,* 144 *N.J.Super.* 152 (Ch.Div.1976); *Fox v. Board of Educ. of W. Milford Twp.,* 93 *N.J.Super.* 544 (Law Div.1967); *Board of Educ. v. Finne,* 88 *N.J.Super.* 91 (Law Div.1965).

Of some further significance is a companion Assembly version of the bill, introduced on February 9, 1981, before the Senate committee acted, which included the word "federal." *Assembly Bill* 3088 (1981). The statement of that bill's sponsor indicated that the "purpose of this bill is to provide the [Authority] with discretion as to the manner in which it shall promote full discussions of public issues by gubernatorial candidates for nomination and election."

focused, in that 1981 amendment, upon candidate coverage, having been confronted with the question of whether the Authority's discretion in such coverage should be limited by both federal and state law, and having decided that it should be limited only by federal law, any arguable impact of these other sections dissolves. Such impact, if any, has in effect been repealed by the 1981 amendment, for there the Legislature spoke unmistakably concerning the Authority's candidate coverage obligations.[9]

The autonomous nature of the Authority is relevant here in deciphering the legislative intent. The Act is replete with evidence that the Legislature wanted the Authority to be independent of governmental control in operating the station.[10] Section 7(h) is a legislative bill of rights for the Authority, charging it with the responsibility to develop programming of "character, diversity, quality and excellence." *N.J.S.A.* 48:23–7(h). The language is suggestive of hope that NJPTV will develop into a vital channel for discussion, controversy, and education in the only way we know, namely through the creative efforts of unrestricted journalists. Even in its sole prohibition—

---

[9]Having concluded that the Legislature intended all questions concerning candidate coverage to be governed by federal substantive law and that the exclusive forum for resolving such questions is the Federal Communications Commission (and on appeal, the federal courts), we need not reach the question of preemption. Justice Pollock has, however, discussed that issue in a separate opinion.

[10]The Legislature's intendment that the Authority enjoy substantial autonomy is consistent with the recommendations of the Governor's Commission on Public Broadcasting for New Jersey:

> [T]he Commission firmly believes that direct government involvement in public broadcasting should be kept to a minimum in order to provide for the fullest flow of information. A new department or division of public broadcasting could only be a viable alternative if organized to provide the desirable degree of flexibility for action and insulated from interference—an insulation which is necessary to promote diversity, experimentation, innovation, and freedom of creativity in public broadcasting. [*Report and Recommendations to New Jersey Citizens, supra*, at 41].

against political endorsement—the Legislature was careful to ensure against implications of any further prohibition. It said that the Authority shall "not be precluded from promoting full discussions of public issues." *N.J.S.A.* 48:23–9.

This independence is explicitly provided for in the Act, *N.J. S.A.* 48:23–3, and is confirmed by provisions concerning the structure and operations of the Authority. The head of the Authority is the New Jersey Public Broadcasting Commission, which consists of ten citizen members and five heads of department. *N.J.S.A.* 48:23–4(a). The citizen members, who outnumber the state representatives two to one, serve for fixed terms and are to be named without regard to political allegiance. *N.J.S.A.* 48:23–4(c). It is that Commission that selects the Executive Director (subject to the approval of the Governor) and it is to the Commission that the Executive Director is responsible.[11] *N.J.S.A.* 48:23–4(g), 48:23–5. Furthermore, all NJPBA employees except those performing stenographic, typing, and other tasks unrelated to public broadcasting, are "unclassified" under civil service, another indication of NJPBA's autonomy.

These provisions make it clear that the Authority is no less independent than such agencies as the Turnpike, Parkway, and Sports & Exposition Authorities, even though it does not have an independent financial existence. Indeed, in some important respects it is even more independent, for unlike the previously named authorities, the minutes, and therefore actions, of the Authority are not subject to veto by the Governor, and its members cannot be removed by the Governor. *N.J.S.A.* 48:23–6.

This grant of independence may have been motivated by more than the Legislature's concern for robust journalism. The Act contemplates that New Jersey's station will work closely with

---

[11]Although the Executive Director may be removed by the Governor, such removal requires notice and hearing, and presumably is limited to good cause. *N.J.S.A.* 48:23–5.

other educational channels, such as WNET's Channel 13,
through voluntary cooperation and agreements arrived at for
their mutual benefit. Such cooperation would be most difficult
if the operators of NJPTV were viewed by their counterparts at
Channel 13 as having substantially less programming independ-
ence or as being restricted in fact or potentially by government
regulations. Such cooperation has occurred and has worked
well. Furthermore, financial sources other than the State Trea-
sury were contemplated by the Act. *N.J.S.A.* 48:23–7(k), *(1)*.
In fact, one third of the station's revenues in fiscal 1980 were
derived from funds other than the State Treasury—including
funds from the Corporation for Public Broadcasting a federal
corporation, which contributed over one million dollars that
year, and WNET (Channel 13), which contributed for the joint
news project, New Jersey Nightly News, somewhat more than a
million dollars. New Jersey Public Broadcasting Authority,
*Annual Report 1980.* These outside funds are not only a symbol
of the Authority's independence but might not be so readily
forthcoming without that independence.

Obviously the Legislature in enacting the minimum time
coverage requirements in 1974 and 1980 asserted some control
inconsistent with this autonomy. For reasons mentioned above,
the Legislature thereafter decided that such intrusion into the
affairs of the Authority was unwise and repealed those require-
ments. The construction of the legislation by the majority,
however, represents a greater invasion of the Authority's inde-
pendence than the previously carefully defined requirements
imposed by the Legislature. While apparently burdensome,
those time requirements were quite specific and, once they were
met, the station's operators were free to resume programming
independent of any legislative control. The majority's formula-
tion leads to permanent control through requirements applicable
to every form of gubernatorial candidate coverage, day in and
day out, as the campaign progresses. And the standard is so
indefinite that it must cause great doubts on the part of those
responsible for programming. It is not enough to say that all

they need to do is try to be fair, for they know that some court or agency may decide that they were not. There will be a definite dampening effect on programming creativity.

Would the Legislature, having thus decided that the station should be independent and having fairly consistently abided by that decision, want to impose such strictures on the operators of this station? Every indication from both the 1981 amendment and the prior treatment of this station points in the opposite direction. The majority's concerns about potential political interference are of course substantial, and must be addressed. There is no doubt that any governmental agency is vulnerable to such control, and certainly the temptations to control a TV station are great. It was in the structure of the Authority, however, that the Legislature wisely sought to create effective obstacles to such control, not through the heavy hand of mandatory programming requirements. That such political control is a risk is obvious, but it was for the Legislature to decide that it was a risk worth taking in view of the perceived advantage of giving this station its only chance to grow into something meaningful through freedom—freedom not only from political control, but from the kinds of strictures and regulations that might be thought necessary to prevent such control.

Here the concern is not the risk of the political unfairness of a privately owned station with its own business interests and the profit motive of the owner. That risk has already been taken by Congress and the FCC by granting almost complete freedom to such stations. It is the risk of political control of a government station that the majority is worried about. It is ironic that the majority thinks the Legislature was unwilling to take the same risk of political unfairness with this station that has no profit motive, and has been created expressly to serve the public interest. We suggest that the risk of political control of this station is preferable to the damage of governmental control of its candidate coverage programming.

The majority suggests that our construction of the law renders *N.J.S.A.* 19:44A–39 superfluous, and, of course, the canons of statutory construction direct that a statute should not be interpreted so as to render it meaningless. 2A C. Sands, *Sutherland, Statutory Construction* (4th ed. 1973), § 46.06. It is not at all meaningless. It is no less meaningless than Section 7(h) of the Act which imposes upon the Authority the responsibility for its own programming. Section 39 (*N.J.S.A.* 19:44A–39), though not intended to be enforced by litigation, is a direction by the Legislature to the station as to how to conduct operations, a guideline for legislative oversight. *Cf. Accuracy in Media v. F. C. C., supra; The Network Project, supra.* The fact that the obligation to promote such full discussion cannot be enforced in any state court or by any complaining party does not mean that the provision is meaningless. Not every law has to have a lawsuit to make it meaningful. Those who hold the purse strings usually do not have to sue their beneficiaries in order to have their wishes respected.

The majority also claims our conclusion that the Legislature directed full discussion, on the one hand, but gave the Authority discretion under federal law concerning compliance, on the other, is contradictory. There is no contradiction at all: the Legislature is telling the Authority—not ordering it—that it should promote candidate discussion (presumably the Authority will voluntarily do so) but that it will be judged solely by federal law as to *all* aspects of its coverage, including the extent thereof. We are confident the Legislature will not find any contradictions in our opinion with its clearly expressed intention, nor will the station experience any contradictions in its operations.

## II.

The majority has decided that the 1981 amendment, along with all of the prior laws, evidences a legislative intent to impose upon the Authority candidate coverage obligations in excess of those provided by federal law and regulations. As to

*all* aspects of its candidate coverage (according to the majority there are no exceptions, although there is some gradation for news coverage) the Authority is required to be "fair, balanced, and equitable" towards all candidates in the primary and general election for governor, taking all of the circumstances, whatever they may be, into consideration. The Court's language is not simply precatory, for any candidate claiming unfairness is presumably given a remedy through the courts.[12] The court is to provide a remedy only if, under all of the circumstances, he can prove that he has been treated unfairly.[13]

To be compared with the majority's facile formulation of a standard that the Authority is supposed to follow (presumably a standard that is thought to be meaningful, one that will provide an actual guide when the Authority and its agents have to make decisions concerning candidate coverage) is the thirty year history of the Congress' treatment of this same subject and the FCC's interpretations thereof, along with the many cases litigated pursuant thereto. There are few tasks that have been found by Congress to be more intractable and complex than devising legislation and a set of rules for the "fair" treatment of candidates on TV. The FCA started out with an equal time provision, 47 *U.S.C.* § 315, that was subsequently interpreted by the

---

[12]Although not discussed by the majority, its intent obviously is to create an enforceable right. We assume it is by means of appeal to the Appellate Division from the Authority's actions, although there are other possibilities. It is unfortunate that the majority, two weeks before the election, provides no guidance to candidates on their remedy.

[13]The majority notes there will be, under its principle, no automatic or absolute right to any specific kind or amount of *coverage*; "fair" treatment is all that is required. *Cf.* the Federal Communications Act and the decisions of the FCC which are inconsistent with this formulation. Where a candidate is given free time on TV (and nothing in the federal law prohibits free time) and none of the exemptions to the equal time requirement of the FCA apply, other candidates have a *right* to obtain time in a period likely to attract approximately the same size audience as the period in which the opposing candidate appeared. *New Primer on Political Broadcasting and Cablecasting*, 69 *FCC* 2d 2209, 2216 (1978).

FCC, *Lar Daly* (Columbia Broadcasting System), 18 *P. & F. Radio Reg.* 238 (1959), to require equal time for all candidates even where the particular candidate covered was shown in a news program. "Equal time" as a congressional standard was not enough; experience showed it had to be tempered with fairness and good common sense.

There followed the congressional exemptions to the equal time provision designed to provide such fairness, 47 *U.S.C.* § 315(a)(1–4). They exempted stations from equal time obligations where the coverage complained of occurred in a *bona fide* newscast, interview program, documentary, and the like. There then followed a multiplicity of FCC interpretations of both the equal time obligation and its exemptions. The proliferation of disputes was such that ultimately the FCC was driven to the conclusion that so long as the candidate coverage occurred in a newscast, interview program, or a documentary, etc., it was automatically exempt, regardless of the source or format of the coverage or the degree to which it disproportionately covered one candidate to the exclusion of others. If included within an exempt broadcast, the FCC has concluded, it is irrelevant that it would not be exempt outside of that context. Broadcasters were thus left leeway to give time to those candidates whom they wished to cover, while giving less or no time to others, by simply including the coverage in one of the exempt formats. And the FCC will not question the broadcasters' decision unless it is shown that such a decision is "clearly unreasonable or in bad faith." *Citizens for Reagan*, 58 *FCC* 2d 925, 927 (1976); *Florio for Governor Committee*, 67 *FCC* 2d 155 (1977). This deference is not an abdication of agency authority, but rather a position wholly consistent with Congressional intent. The 1959 amendments to the FCA, which established the exemptions, include the term "bona fide" in describing each category as a deliberate method of maximizing broadcaster discretion. House Committee Chairman Harris, floor manager of the amendments in the House, said the term "sets up a test which appropriately leaves reasonable latitude for the exercise of good faith news judgment

on the part of broadcasters and networks . . . . " 105 *Cong.Rec.* 17782 (1959).

More was involved in these FCC decisions than the belief that the proliferation of TV stations had guaranteed fair coverage, for obviously it was, and is, still possible that all of the stations together covering a particular campaign would be unfair to a particular candidate. What was involved really was the frustration felt by the FCC arising from the enormous difficulty of the problem assigned to it: it was simply impossible to determine how to interpret the exemptions—a task assigned to the FCC by Congress—while keeping in proper balance the legitimate and almost overriding need of the stations for independence in their editorial judgments about coverage. Given this situation the FCC opted, little by little, for very substantial freedom for the TV operators. Its beliefs have finally crystallized into a publicly stated position by the FCC that *all* of the provisions concerning equal time and fairness to candidates should be repealed.[14]

It is this problem that the majority thinks it has addressed by requiring the Authority and its TV station to be "fair." It really has not even scratched the surface. Yes, it notes the complexities, the differing circumstances, the interplay of factors that might affect a decision in one instance and not in another, the circumstances that might result in one candidate getting less time than the other, but all of that simply represents a recognition of the obvious complexity of the problem without providing a solution for it.

What the majority has done is impose upon the courts the duty of solving immediately a problem that Congress and the FCC have not been able to solve for 30 years. We say "immediately" for the legislation which the majority finds was part of the statutory scheme that imposed this new obligation was

---

[14]*FCC* Chief to Seek Repeal of Two Rules on Airing of Issues, The New York Times, *September 16, 1981, § A at 21;* An Equal-Time Disagreement on F. C. C. Rules, The New York Times, *October 18, 1981, § 4 at 10E.*

passed by both houses and then signed by the Governor in April of 1981, about two months before the primary election. If the majority thinks that our courts were preparing for this event they are mistaken. Our courts had absolutely no advance warning, had made no preparations, had no experience and probably little expertise in a subject requiring great expertise. They were, according to the majority, expected to adjudicate disputes among 21 candidates, disputes of the most complex nature, disputes that would have been asserted and required resolution practically immediately, for these questions cannot be put aside for future study.

The unreality of the majority's conclusions is best perceived by recalling the situation when the Legislature passed this amendment in 1981. The notion that the Legislature intended in April 1981 to thrust this new obligation (for we assume that even the majority would agree that no matter what *it* thinks the law is, neither the Authority nor the courts were prepared for the majority's *post hoc* discovery of this law) on the courts two months before the primary election is incredible. What did the Legislature intend in April 1981, two months before the most complex, confused primary election in New Jersey history? The answer is clear: it intended to adopt the settled rules of federal law administered by the FCC, not some new ill-defined standard with no one with expertise to interpret and enforce it.

But even today, the majority's result spells chaos. One group of candidates (there are 13 gubernatorial candidates) may seek relief through the FCC, another through New Jersey's courts, with differing results and differing policies perhaps guiding both. There is no basic "fairness" or "fair treatment" doctrine (as the majority uses those terms) guiding the FCC, and there is no "equal time" doctrine guiding our courts. On the same dispute where more than one candidate complains about the same failure of coverage, one may go to the FCC and get no relief, the other to our courts and obtain relief; appeals may be pending in the Court of Appeals in a Federal Circuit, while the same issue is being decided by the Appellate Division in New

Jersey. The frictions between the federal and state systems inherent in this interpretation by the majority are to be deplored.[15]

What the Legislature intended, and wisely we believe, was to commit all of these problems to the FCC. As it indicated explicitly and unmistakably, the Legislature wanted only federal substantive law to govern disputes about candidate coverage. It would make little sense to go that far and then to say that the federal substantive law should be interpreted by some agency in New Jersey or by our own courts. The FCC had more than 30 years of experience in developing that substantive law, it had been given by Congress the power to interpret the Federal Communications Act, 47 *U.S.C.* 315(d), it had unparalleled expertise in the field. It seems obvious that the Legislature intended the FCC to be the sole arbiter of these disputes, and the federal courts the only courts through which FCC determinations could be challenged.

This very case demonstrates the pitfalls of the majority's conclusions. It is obvious, and understandable, that we are a much better educated Court on this issue than we were the day we first decided the case, after only a few hours of study, but that is how most of these cases will have to be decided: on short notice, with little time to study and reflect, by courts ill-suited for the task. The point is that the New Jersey Supreme Court itself was and is far from expert in this essentially regulatory field, yet we stand now committed to a decision fundamentally at variance with the operating rules of the Federal Communica-

---

[15]Several of NJPTV's most popular and informative programs, including "New Jersey Nightly News," are apparently produced in cooperation with Channel 13, which station also presents these programs. We do not know whether the added control over programming independence imposed by the majority will affect this most productive venture, but with different sets of rules now applicable to each station, and the possibility of court injunctions a real one, Channel 13 might want to review its participation with such a vulnerable partner. It would be regrettable if Channel 13 should withdraw and New Jersey Nightly News terminate.

tions Commission, which on precisely the same issue ruled through its staff, that the program on which the challenged coverage occurred was exempt from regulation; the kind of standard imposed by this Court to be used in New Jersey to test candidate coverage played no part in its decision. *See In re Ann Klein*, Docket No. 8330–B, C5–860 (5/29/81). The majority's conclusions must inevitably lead to confusion of all kinds, to say nothing of a dilution of the public's confidence. How else are people to react when this Court, through strained reasoning, adopts a standard of content review totally at variance with the federal agency acknowledged to be the expert in the field? How can we explain to anyone this Court's assertion of reviewing power in accordance with *New Jersey* law, leading to such contrary principles, in the face of a statute that clearly directs that campaign coverage be determined "in accordance with *federal* law"?

## III.

How, it might be asked, can anyone be harmed by subjecting an Authority to a rule of balance, to a standard of fairness, to a requirement of equity? It sounds so simple and so right, yet it is so complicated and so wrong. Not only is the doctrine of fairness one of the most complex in the field of broadcast regulation, not only is its enforcement by courts one of the most difficult judicial tasks, but, apparently unrecognized, there is a competing interest, and another complicated issue. The competing interest is that of a free press and the other issue is the effect of regulations of this sort on untrammeled programming, editorial judgment, and news coverage. It is not enough to say to those who value the freedom of the press that great deference will be given to their judgments about what is newsworthy and what is fair in coverage as the court reviews their programming, newscasting, and editorial determinations. Are our judges equipped for this task? Will they do it any better than other censors who have failed in the past?

We mention the impact of the majority's decision on the ability of the station to make its own decisions concerning programming freely, not as an appeal to a particular policy but as an aid to legislative intention.  There are obviously competing values involved: on the one hand we all want full coverage of the candidates in New Jersey elections, our station is uniquely suited to provide such coverage, and we want it to be fair. Present federal law and regulations as well as adjudicated decisions by the FCC give us some assurance that this will be the case but perhaps, we think, not enough.  We therefore look for something else.  A substantial argument can presumably be made ·that it is good policy to impose such additional requirements.  On the other hand, in interpreting the legislation—and we believe it really requires no further interpretation—it would be a mistake to minimize, as the majority seems to have done, the impact of its decision on the ability of this station to thrive and develop.[16]  Not only will its operators not know (in a

---

[16]Some of these concerns are outlined in a recent comment on content regulation in broadcasting: "Broadcasters and commentators have long contended that the existence of content regulation inhibits the coverage of controversial issues on radio and television." "Comment: The Future of Content Regulation in Broadcasting," 69 *Cal.L.Rev.* 555, 591 (1981).  The result, they argue, is a chilling effect on broadcasters:

> According to those who assert its existence, the chilling effect has two components.  The first is the expense involved in dealing with an accusation of unbalanced coverage.  When a program dealing with a controversial issue is presented, demands for reply time are inevitable.  Normally, these are refused; as the next step, the demanding parties file complaints with the FCC.  While the FCC dismisses most complaints without referring them to the broadcaster for comment, a significant number do reach the broadcaster.

> It is at this point that the expense begins.  The broadcaster must devote the time of key personnel to the investigation of the complaint, prepare correspondence with the FCC, and consult attorneys both locally and in Washington.  This activity can cost a small broadcaster $20,000 or more, and more than $100,000 if a major network becomes involved—all to determine, in most instances, only that the broadcaster had provided an adequately balanced coverage of the relevant issues.

> If the FCC determines that this balance has not been adequate, the cost is even higher.  The broadcaster must then devote valuable air time, often

practical way so as to guide them) what standards they are supposed to conform to, but since the obligation covers absolutely all gubernatorial candidate coverage, news, interviews, spots, documentaries, statements, and the like, there will never be a time when those who determine the station's programming can sit down and honestly discuss and decide, for themselves, as creative journalists, just what would be in the best interest of the public when it comes to candidate coverage. They will not be able to decide, by themselves, how to convey most effectively what a campaign is all about. There will always be the presence of government sitting with them at every meeting, influencing their decisions through "standards" and mandates. The creative energy that bursts only in an atmosphere of freedom will be stifled by the rule of the majority.

We realize that the First Amendment protection of speech has been applied differently to radio and television because of the

at no charge to the speaker, to the presentation of an opposing viewpoint. This, of course, reduces the broadcast time available for programming the broadcaster deemed more valuable or for advertising.

The second component of the chilling effect is the possibility that the FCC will revoke or refuse to renew the broadcaster's license because it failed to present the desired balance. Thus, every time a program elicits a request for the presentation of alternative viewpoints, the broadcaster must consider the effect of its refusal on license renewal. The risk that the FCC will impose such a sanction is actually very small; the possibility, however, is always present and therefore cannot be ignored.

Faced with these possibilities, it is not surprising that the broadcaster may reduce the station's coverage of controversial issues, especially if it has gone through the complaint process before. In that way the broadcaster minimizes the probability that it must undergo such an ordeal.

Because documentaries and other issue-oriented programming are traditionally the least lucrative broadcast formats, this chilling effect assumes an even greater significance. It is much less painful to cut back on low profit programming than it is to cut a moneymaker. The result is a "fastidiously balanced coverage of very few controversial issues" rather than the "uninhibited, robust, and wide-open" debate envisioned by the proponents of content regulation. [*Id.* at 591–93 (footnotes omitted)].

The same impact on candidate coverage is the likely effect of the majority's rule.

special characteristics of these electronic broadcasting media. *Red Lion Broadcasting Co. v. F. C. C.*, 395 *U.S.* 367, 386, 89 *S.Ct.* 1794, 1804, 23 *L.Ed.*2d 371, 387 (1969). But we believe that the New Jersey Legislature, having carefully created the Authority as an autonomous agency, independent of both the Governor and the Legislature, never would have intended such a standard, oppressive in its effect, to be imposed upon an Authority that it explicitly charged with the responsibility to determine its own programming independently. *N.J.S.A.* 48:23–7(h). Our point here, however, is that if the majority has proceeded on the theory that it is assuring fairness to candidates without doing much damage to the ability of this station and those who operate it to develop the kind of dynamic image and personality that will allow it truly to compete with stations that operate in an atmosphere of freedom, it is mistaken.

The rule of the majority will tend to turn journalists into bureaucrats, Ed Murrows into lawyers. We do not know now what its real effects will be, for the impact of these restraints on journalistic freedom is very hard to measure over a short period of time. It is sufficient for our purposes to agree with the United States Supreme Court that:

> For better or for worse, editing is what editors are for; and editing is the selection and choice of material. That editors—newspaper or broadcast—can and do abuse this power is beyond doubt, but that is no reason to deny the discretion Congress provided. Calculated risks of abuse are taken in order to preserve higher values. The presence of these risks is nothing new; the authors of the Bill of Rights accepted the reality that these risks were evils for which there was no acceptable remedy other than a spirit of moderation and a sense of responsibility—and civility—on the part of those who exercise the guaranteed freedoms of expression. [*CBS, Inc. v. Democratic National Comm.*, 412 *U.S.* 94, 124–25, 93 *S.Ct.* 2080, 2097, 36 *L.Ed.*2d 772 (1973)].

The restraint implicit in the majority's rule is substantial and one that this Court would not ordinarily impose, given its history of solicitude for freedom of the press, without the

strongest evidence of a legislative intent.[17]   There is none: indeed there is quite the opposite.

## IV.

In this case, with the best of intentions, the majority has ventured into an area that is beyond the expertise of the most expert, an area where the greatest damage can be done if those dealing with the subject matter are not extremely sensitive to the problems involved.   The simple faith that promulgating a standard of "balance, fairness, and equity" and allowing the courts to enforce that standard will resolve the competing interests of fair coverage and freedom of publication is misplaced.   It is extremely difficult to find a satisfactory middle ground between absolute freedom and total control in these matters.   While the Court would allow the Authority considerable discretion in determining its programming based upon all of the facts and circumstances, it is not at all clear whether the reviewing entity will conclude that some facts and circumstances were not sufficiently evaluated or weighed and that the result constituted an abuse of that considerable discretion.   It is

---

[17]The First Amendment questions engendered by the growth of public broadcasting are many, diverse and difficult.  *See* Canby, "The First Amendment and the State as Editor: The Implications of Public Broadcasting," 52 *Tex.L.Rev.* 1123.  Not the least of these is the concern that political control of a broadcast medium "might magnify the dangers attending government promulgation of a point of view.  The first of these dangers . . . is self-perpetuation by those in political power.  A second threat, related but distinguishable, is that of interference with the editorial freedom of persons actually preparing the program offerings."  *Id.* at 1151 (footnotes omitted).  It was these very concerns about political control that led the Carnegie Commission to recommend that the Corporation for Public Broadcasting be established as an independent nongovernmental entity.  *The Report and Recommendations of the Carnegie Commission on Educational Television: Public Television, A Program for Action* (1967) at 37.  Similar concerns were expressed by the Governor's Commission on Public Broadcasting for New Jersey: "It is the Commission's firm judgment that direct government involvement in public broadcasting should be kept to a minimum and that a new state department would not afford the desirable degree of insulation from political interference and entanglements."  *Public Broadcasting for New Jersey* (1968) at 29.

bitter medicine to a minority candidate to tell him that balance, fairness and equity allows him only 15 minutes while major candidates are given 20 hours. He will say that you, the State, are making certain that he will never be known, that your impression of him as an unknown candidate is self-fulfilling prophecy, and that your control of the main channel of public communications requires you to do more in your allocation of time than count the noses of those who have already heard of him through other means. And the major candidate will say it is unfair to give a minor candidate what the major candidate deems to be excessive time simply because the station views a particular issue seized upon by the minor candidate as one of overriding public interest—or at least one that the station believes should *become* of overriding public interest. How do you decide what is "balanced" or "fair"? How do you review these determinations, which involve not only a group of complex factors and circumstances but also value judgments that simply are not subject to review by any consistent rational standard— an essential ingredient to any system of administrative review. With such a vague set of guidelines as "basic fairness" and "fair treatment" the courts will either, like the FCC, abandon their role completely, or ultimately become, in effect, the arbiter of what is fair and equitable in campaign coverage.

We do not mean to suggest that there can never be devised workable standards of coverage that tend to assure fairness and provide minimal interference with the editorial freedom that is required if a station is to perform its essential function of serving the public interest. It has not been done yet, however, and it certainly is not done in the majority opinion. The most likely result of the majority's efforts, besides all of the other adverse impacts mentioned herein, will be the transformation of what is becoming a vibrant television station providing exciting coverage of New Jersey events, issues and candidates into an increasingly dull transmitter of selected segments of a campaign, selected by people more concerned with the bureaucrats

and judges who will review their editorial determinations than with the public that is supposed to benefit from their programs.

Based on the record in this case, it appears to us that, in a very difficult situation, NJPTV provided excellent coverage of the primary. This Court—including us—concluded the coverage could even be better when, during the critical last week of the campaign, we ordered the station to give scarce prime time equally to all candidates even though it had become absolutely clear that the campaigns of some of them, regardless of the candidates' merits, had become meaningless politically. Every hour of that prime time given to such campaigns because of our decision was taken away from the candidates who mattered to the public; more pointedly, every such prime time hour was taken away from a public that very much wanted to know more about the candidates it thought important, and had very few hours left.

During those critical last days of the campaign, we substantially diminished the public's opportunity to learn more about the candidates that counted—not to us, not to NJPTV, but the candidates that counted to the public. One can only imagine the damage that will result when that kind of judicial supervision of campaign coverage, almost always on an emergent basis, is applied to an entire campaign, as it will under the majority's rule, instead of just to the last few days. The majority's new rule, while it leads to a reversal of our damaging prior judgment, guarantees that our courts will continue in this and future campaigns to inflict the same kind of damage on the station, the candidates, and the public.

Worse yet, even though not specifically determined in this case, is the irresistible conclusion from the majority's reasoning, that from now on at all times—not just at campaign time—our courts under Section 7(h) will also act as overseer of the station's coverage of controversial issues.

We concur in the reversal of the Appellate Division's judgment and in the dismissal of McGlynn's prerogative writ action.

POLLOCK, J., concurring.

I concur in the result, but not the reasoning, of the majority. The difference is significant. With Chief Justice Wilentz, I believe that the New Jersey Legislature intended that NJPTV be subject only to federal law in its coverage of political candidates. My disagreement with the majority, however, runs deeper.

Despite comprehensive federal regulation of political. broadcasting, administered by an agency capable of ensuring the precise result the Court reaches today, the majority holds that New Jersey's courts may review independently the broadcasting decisions of the journalists of NJPTV. It reaches that conclusion by finding that state control over the content of the news is justified by state ownership of NJPTV. I disagree.

Historically the relationship between the courts and the media has been an uneasy one, calling for a careful balance of extraordinarily sensitive considerations. This case involves a particularly volatile mix of interests. We are attempting to reconcile a gubernatorial candidate's demand for access to the airwaves with the right of a federally licensed broadcaster to exercise journalistic discretion, all the while keeping our eye on the needs of the public for information. This reconciliation is complicated because the broadcaster is a publicly-financed television network providing the only significant daily coverage of New Jersey news. Our task becomes even more difficult because of the existence of a pervasive federal regulatory scheme governing political broadcasting, carefully structured by Congress and entrusted for enforcement to the FCC with review by the federal courts. These competing considerations, which probe deeply one's perception of the proper relationship of a free press, the judiciary and the public interest, cause different members of this Court to see the issues differently.

## I

Two problems merit attention. First, the effect, albeit unintended, of the majority opinion may be to convert NJPTV into a

public forum. Not only is that result contrary to the intention of the New Jersey Legislature, but it creates a myriad of problems unforeseen by the majority. Second, regulation of broadcasting under federal law assures fairness for all concerned: NJPTV, political candidates and the people of New Jersey. State laws as interpreted by the majority, however, over-regulate broadcaster discretion and may well be preempted by the federal regulatory scheme.

Before discussing these issues, it may be helpful to state what this case is not. It is not a case in which a candidate was denied all access to the television stations or was precluded from using the airwaves to advance his candidacy. Nor is it a case in which a publicly-financed broadcaster refused to cover a significant political campaign. The majority concedes as much. Furthermore, the question is not whether political broadcasting should be fair. Of course political broadcasting should be fair, and fairness has been assured by the United States Congress and the Federal Communications Commission. Nor is the question whether broadcasting may be regulated. It may, and federal law creates a pervasive scheme of regulation. What this case is about is whether the State should superimpose its control of broadcasting on federal regulation. My answer is in the negative.

The inescapable implication of the majority opinion is that the Legislature entrusted the State, not NJPTV, with editorial discretion in television programming. The further implication is that the State, through its courts, may supervise the editorial process. This dangerous doctrine prompts my disagreement.

## II

My fundamental concern with the majority opinion is that it opens a Pandora's box letting loose unforeseen problems about public access to public television stations. Initially, I believe that the majority opinion threatens to convert NJPTV into a public forum. The path to a "public forum" is over uncertain

ground enshrouded by the mists of the First Amendment. Recent federal cases, however, demonstrate the reality of the risk of converting a public television station into a public forum. In *Muir v. Ala. Educational Tel. Com'n,* 656 *F.2d* 1012 (5 Cir., 1981), the United States Court of Appeals for the Fifth Circuit divided on whether a public television station was a public forum. The majority declined to find a public forum primarily because there was no evidence in the record to support a finding that the government was operating the public station. *Id.* at 1018, 1018–19 n.11. The dissent, however, declared flatly that "whenever a state agency supervises broadcast programming, even when it holds the broadcast license, it may not discriminate between points of view on issues of public controversy." *Id.* at 1027.

In *Barnstone v. Univ. of Houston,* 514 *F.Supp.* 670 (S.D.Tex. 1980) (appeal pending, 5 Cir., No. 81–2011), the court concluded that a public television station was a public forum. The court wrote: "a public forum is a place that is (1) controlled by the government and (2) appropriate as a place for the communication of views on issues of political and social significance . . . . There is no question that KUHT–TV is precisely such a place." 514 *F.Supp.* at 685.

I recognize that the FCC has noted twice, without discussion, that publicly-held noncommercial broadcasters are not subject to the public forum doctrine. *See City of New York Municipal Broadcasting System,* 56 *F.C.C.2d* 169, 170 (1975) ("the public forum doctrine is inapplicable to broadcast licensees"); *Mississippi Authority for Educational Television,* 71 *F.C.C.2d* 1296, 1312 n.23 (1979). Furthermore, the United States Supreme Court has not determined the degree of governmental involvement necessary to result in a finding of state action and consequent conversion of a public television station into a public forum. Nonetheless, in *Columbia Broadcasting System v. Democratic National Committee ("CBS v. DNC"),* 412 *U.S.* 94, 93 *S.Ct.* 2080, 36 *L.Ed.2d* 772 (1973), three members of the Court concluded that the status of the networks as federal licensees

was sufficient governmental action to require at least that "individuals be permitted *some* opportunity to express their views on public issues over the electronic media." *Id.* at 201, 93 *S.Ct.* at 2136 (Brennan and Marshall, JJ., dissenting) (emphasis in original); *see id.* at 149–150, 93 *S.Ct.* at 2109–10 (Douglas, J., concurring). Under the constraints of deciding this case, we need not determine whether NJPTV is a public forum. The majority decision, nonetheless, raises the question whether the State could own, operate and regulate NJPTV without converting it into a public forum. One implication of the majority decision is that NJPTV could be "obligated to grant the demands of all citizens to be heard over the air, subject only to reasonable regulations as to 'time, place and manner.'" *CBS v. DNC, supra,* 412 *U.S.* at 139, 93 *S.Ct.* at 2104 (Stewart, J., concurring). I am confident the Legislature never intended that result.

### III

The Legislature intended NJPTV to be an autonomous agency free from its control and that of the Governor. Concededly, the Legislature could have created an agency that was an arm of the State. I believe, however, that the Legislature created NJPTV as an independent broadcaster subject to federal, but not state, regulation.

This case makes manifest the inevitability of conflict in dual regulation of political broadcasting. Here, the Appellate Division ruled that NJPTV must include *all* candidates in the Closer Look part of New Jersey Nightly News. This Court affirmed. The FCC decided, however, that NJPTV need not include all gubernatorial candidates in Closer Look. *See In re Ann Klein,* Docket No. 8330–B, C5–860 (May 29, 1981). Now, five months later, this Court agrees that NJPTV and the FCC were right all along. That is, this Court now determines that NJPTV could have broadcast the Closer Look with the leading candidates only. These contradictory decisions do not exhaust the contra-

dictions that may occur in the future. What if, last spring, the federal courts had reversed the FCC while this Court had reversed the Appellate Division? In discussing possible permutations one is limited only by the scope of one's imagination.

The abiding problem in the majority decision is that the journalists of NJPTV will exercise their freedom of speech under a judicial sword of Damocles. As Chief Justice Wilentz demonstrates (*ante* at 148), NJPTV may abandon in-depth coverage of leading candidates for superficial coverage of all candidates in a crowded field. Thus, judicial intervention may lead to journalistic paralysis. The real losers are the people of New Jersey who may be deprived of information about those gubernatorial candidates in whom they are most interested.

A conflict between federal and state regulation of political broadcasting raises substantial questions of preemption. A state law is preempted where federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it." *Rice v. Santa Fe Elevator Corp.*, 331 *U.S.* 218, 230, 67 *S.Ct.* 1146, 1152, 91 *L.Ed.* 1447 (1947). Preemption also occurs whenever a state enactment "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 *U.S.* 52, 67–68, 61 *S.Ct.* 399, 404, 85 *L.Ed.* 581 (1941).

Congress has enacted a pervasive scheme of regulation of political broadcasting. The part of federal regulation relevant to this case is the fairness doctrine. That doctrine imposes on a broadcaster the obligation "to make a reasonable, good faith judgment on the significance of a particular candidate and on this basis to decide how much coverage should be given to his candidacy and campaign activities. The broadcaster is not required to give as much coverage to 'fringe' party candidates as major party candidates." *The Law of Political Broadcasting and Cablecasting*, 69 *F.C.C.*2d 2209, 2301 (1978).

This deference to the judgment of the broadcaster is the result of "nearly a half century of unmistakable congressional

purpose to maintain—no matter how difficult the task—essentially private broadcast journalism held only broadly accountable to public interest standards." *CBS v. DNC, supra,* 412 *U.S.* at 120, 93 *S.Ct.* at 2095. In this respect, the editorial judgment of a public television station is entitled to the same deference as that of a private broadcaster. *Community-Service Broadcasting of Mid-America, Inc. v. F. C. C.,* 593 *F.*2d 1102, 1110 (D.C.Cir. 1978) (*en banc*). The majority, however, undertakes to supplement, if not supplant, the federal regulatory scheme with its own amorphous test of "fairness". I see no room or need for a state fairness doctrine superimposed on a federal fairness standard designed as part of "a delicately balanced system of regulation intended to serve the interests of all concerned." *CBS v. DNC, supra,* 412 *U.S.* at 102, 93 *S.Ct.* at 2086.

Thus, my disagreement focuses on the rule to be applied, not the application of the rule. I would reverse the judgment of the Appellate Division and dismiss the complaint.

WILENTZ, C. J., and POLLOCK, J., concurring in the result.

*For reversal*—Chief Justice WILENTZ and Justices PASHMAN, SCHREIBER, HANDLER, POLLOCK and SULLIVAN —6.

*For affirmance*—None.